COURT OF APPEALS OF VIRGINIA


Present:   Judges Annunziata, Clements and Kelsey
Argued at Salem, Virginia


STEPHEN MICHAEL McCARY

                                                          OPINION BY
v.        Record No. 1666-02-3              JUDGE ROSEMARIE ANNUNZIATA
                                                          DECEMBER 30, 2003
COMMONWEALTH OF VIRGINIA


           FROM THE CIRCUIT COURT OF ROCKINGHAM COUNTY
                          James V. Lane, Judge

           A. Gene Hart, Jr., for appellant.

           Amy L. Marshall, Assistant Attorney General (Jerry W. Kilgore,
           Attorney General, on brief), for appellee.


        Stephen Michael McCary was convicted after a bench trial of construction fraud and

larceny in violation of Code § 18.2-200.1.  He challenges the verdict on the following grounds:

the evidence was insufficient to establish fraudulent intent; he was not the criminal agent because

he was an employee of a corporation; and the notice letters sent to him by the homeowners were

legally defective.  For the reasons that follow, we affirm the decision of trial court.

                                    I.  Background

        On appeal, we view the evidence, and all reasonable inferences arising from the evidence,

in the light most favorable to the Commonwealth because it prevailed below.  Commonwealth v.

Grimstead, 12 Va. App. 1066, 1067, 407 S.E.2d 47, 48 (1991).  So viewed, the evidence

establishes that McCary was the registered agent of a Harrisonburg, Virginia-based modular

home building corporation known as Sudden Housing II, LLC (the company), and its

predecessor, Advanced System Builders, during the years 1999-2001.  Although not the owner of

the company, McCary held himself out to be the company's president and was a signatory on the

company's bank account at Rockingham Heritage Bank.  McCary also referred to himself as general manager of the company, as well as financial director of the company.  Neither McCary nor the company had a Virginia Contractor's License.

## A.  Botkin Home

In the fall of 1999, Freddie and Linda Botkin entered a contract to build a modular home with Advance System Builders, which later became Sudden Housing II.  McCary negotiated the contract and executed it.  McCary told the Botkins that the house would be completed by Thanksgiving 1999.  On September 15, 1999, the Botkins wrote a check to Advance System Builders in the amount of $1,000 as a deposit on the contract.  The Botkins then obtained a construction loan through City Mortgage Group.  Pursuant to the schedule submitted by McCary on October 22, 1999, the mortgage company remitted a check, payable to Sudden Housing II, in the amount of $13,557.10.  McCary endorsed the check and deposited it into the company's bank account.

The home was not completed by Thanksgiving as promised.  The modular home finally arrived on February 7, 2000.  On that day, the Botkins' mortgage company made another draw on the construction loan and forwarded a check, made payable to Advanced System Builders, in the amount of $37,255.50.  McCary endorsed the check and deposited it into the company's bank account.

The same day, the mortgage company remitted a check in the amount of $86,000 directly to All American Homes.  The home was "set" on the foundation the following day, at which time McCary told the Botkins it would be completed by June of 2000.  That very month, a check written by McCary to a contractor for work on the garage was returned for insufficient funds.  On or about April 15, 2000, the Botkins received a letter from Sudden Housing II, signed by

McCary as the general manager, informing them that their home had been "seriously underpriced" and stating that it had caused a "serious cash flow problem" for the company.

In the fall of 2000, Vernon Reynolds, a criminal investigator with the Department of Professional and Occupational Regulations, began an investigation and met with McCary to discuss the Botkins' home. McCary stated he was the general manager of the company, admitted the Botkins' home had not been completed, and assured Investigator Reynolds he would see that "things were taken care of."

Investigator Reynolds met with McCary on January 23, 2001, and McCary again told him that he would have someone on the site to finish the job within weeks. Investigator Reynolds told McCary that if he and the company obtained their licenses and finished the work, the investigation would end and no further proceedings would occur. The investigator had two or three more brief telephone conversations with McCary during which McCary continued to assure him that the house would be completed. The house was never completed.

On March 22, 2001, the Botkins sent, via certified mail, a notice pursuant to Code § 18.2-200.1 to McCary at Sudden Housing II. The notice demanded the return of all advanced funds. The letter came back unclaimed, however, and the Botkins neither received a response to their letter nor a refund of any money. The Botkins later learned that Sudden Housing II had filed for bankruptcy in the spring of 2001.

B. Sharp Home

On June 23, 2000, William and Linda Sharp gave a check in the amount of $1,000, payable to Sudden Housing II, to McCary as a deposit for a modular home plan. The Sharps then entered into a contract on August 11, 2000 to purchase the home. McCary signed the contract as president of Sudden Housing II. The following day the Sharps gave McCary a check,

payable to Sudden Housing II, in the amount of $45,438 to pay for the foundation, garage and deck as provided for in the contract.

The foundation was never poured, and the garage and deck were never constructed; in fact, the Sharps never received the plans for the garage and deck. In late November 2000, the manufacturer delivered the Sharps' modular home, but it could not be "set" because the foundation had not been laid. Pursuant to McCary's request, however, the Sharps wrote a check for $110,000 upon the house's arrival.

The Sharps inquired as to when the foundation would be ready, and McCary repeatedly claimed that they were "working on it." The foundation was never poured, the deck and garage were never built, and the home was never completed.

The Sharps hired attorney William Beeton to represent them. On February 8, 2001, Beeton sent a letter, via certified mail, to McCary at Sudden Housing II, demanding he return the advanced funds. Neither Beeton nor the Sharps received a response from McCary despite the notice and numerous phone calls.

The Commonwealth charged McCary with two counts of violating Code § 18.2-200.1. He was found guilty after a bench trial. McCary appeals the convictions and presents four arguments before this Court: 1) the Commonwealth's evidence was insufficient to prove he obtained the advances with fraudulent intent; 2) McCary's status as an employee of Sudden Housing II shielded him from any criminal liability; 3) the Botkins sent him a defective notice letter because it contained an incorrect zip code; and 4) the notice letters from the Botkins and Sharps failed to conform to statutory requirements because they requested the return of all funds advanced.

Under familiar principles, when the sufficiency of the evidence is challenged on appeal, we "review the evidence in the light most favorable to the Commonwealth, granting to it all

reasonable inferences fairly deducible therefrom." Ortega v. Commonwealth, 31 Va. App. 779, 786, 525 S.E.2d 623, 627 (2000). Also, "[t]he judgment of a trial court sitting without a jury is entitled to the same weight as a jury verdict, and will not be disturbed on appeal unless plainly wrong or without evidence to support it." Beck v. Commonwealth, 2 Va. App. 170, 172, 342 S.E.2d 642, 643 (1986).

For the reasons that follow, we affirm.

## II. Fraudulent Intent

On appeal, McCary first contends that the Commonwealth failed to prove that he obtained advances from the Botkins and Sharps with the requisite fraudulent intent. We disagree.

Code § 18.2-200.1 provides as follows:

> If any person obtain from another an advance of money, merchandise or other thing, of value, with fraudulent intent, upon a promise to perform construction, removal, repair or improvement of any building or structure permanently annexed to real property, or any other improvements to such real property, including horticulture, nursery or forest products, and fail or refuse to perform such promise, and also fail to substantially make good such advance, he shall be deemed guilty of the larceny of such money, merchandise or other thing if he fails to return such advance within fifteen days of a request to do so sent by certified mail, return receipt requested, to his last known address or to the address listed in the contract.

Thus, under the statute, the Commonwealth had to prove that McCary: (1) obtained an advance of money from another person, (2) with fraudulent intent at the time the advance was obtained, (3) made a promise to perform construction or improvement involving real property, (4) failed to perform the promise, and (5) failed to return the advance "within fifteen days of a request to do so by certified mail" to McCary's last known address or his address listed in the contract. Klink v. Commonwealth, 12 Va. App. 815, 818, 407 S.E.2d 5, 7 (1991). Fraudulent intent is examined at the time McCary procured the advance, not when the parties entered into

- 5 -

the contract.  Rader v. Commonwealth, 15 Va. App. 325, 329, 423 S.E.2d 207, 210 (1992) (construing Code § 18.2-200.1).

Whether McCary had a fraudulent intent at the time he obtained the advances depends upon the circumstances of the case.  Norman v. Commonwealth, 2 Va. App. 518, 520, 346 S.E.2d 44, 45 (1986).  "Intent may, and most often must, be proven by circumstantial evidence and the reasonable inferences to be drawn from facts that are within the province of the trier of fact."  Ellis v. Commonwealth, 29 Va. App. 548, 555, 513 S.E.2d 453, 456 (1999).  Circumstantial evidence may be more compelling and persuasive than direct evidence, and it is entitled to as much weight as direct evidence when convincing.  Jett v. Commonwealth, 29 Va. App. 190, 194, 510 S.E.2d 747, 748-49 (1999).  The Commonwealth must exclude reasonable hypotheses of innocence that flow from circumstantial evidence.  Welshman v. Commonwealth, 28 Va. App. 20, 36, 502 S.E.2d 122, 130 (1998) (en banc).  It need not, however, "'disprove every remote possibility of innocence, but is, instead, required only to establish guilt of the accused to the exclusion of a reasonable doubt.'"  Cantrell v. Commonwealth, 7 Va. App. 269, 289, 373 S.E.2d 328, 338 (1988) (quoting Bridgeman v. Commonwealth, 3 Va. App. 523, 526-27, 351 S.E.2d 598, 600 (1986)).

We have held that certain circumstances, applicable to the case at bar, are probative of fraudulent intent.  See, e.g., Norman, 2 Va. App. at 521, 346 S.E.2d at 46 (finding that intent can be inferred from failure to do anything in furtherance of promise after receipt of advance); Rader, 15 Va. App. at 330, 423 S.E.2d at 210 (noting that failure to apply for a permit gives rise to an inference of fraudulent intent); Id. at 330-31, 423 S.E.2d at 211 (holding that a "general lack of communication with the homeowners" is probative of fraudulent intent); Norman, 2 Va. App. at 521, 346 S.E.2d at 46 (noting that a contractor's failure to contact the consumer, when the contractor realized he was financially unable to perform construction, was probative); Rader, 15

Va. App. at 330, 423 S.E.2d at 211 (commenting that a request for an advance accompanied by a promise to complete followed by a failure to complete was probative); Hubbard v. Commonwealth, 201 Va. 61, 67, 109 S.E.2d 100, 105 (1959) (finding that other similar transactions by defendant using false representations was probative of fraudulent intent).

Here, McCary's representations and conduct, when taken together, provided a sufficient basis from which the trial court could conclude that McCary acted with fraudulent intent. First, McCary's numerous unfulfilled promises to complete the Botkins' and Sharps' homes are probative of his fraudulent intent. See Norman, 2 Va. App. at 521, 346 S.E.2d at 46. He initially promised the Botkins that their modular home would be completed by Thanksgiving 1999, but it did not arrive until February 7, 2000. He then promised that the home would be completed by June 2000. McCary admitted in April 2000 that his company had underpriced the Botkins' home and, consequently, that it was experiencing severe cash flow problems. He nonetheless promised Investigator Reynolds in January 2001 that the Botkins' home would be completed within a few weeks. He made the same promise to Investigator Reynolds two or three more times by telephone. The house, however, was never completed. McCary made similar promises to the Sharps, telling them that he was "working on" their home's foundation. Contrary to McCary's assurances, the foundation was never laid and the Sharps' home was never completed. The trial court could reasonably infer from this evidence that McCary never intended to fulfill his promises.

Second, McCary's failure to obtain a license is probative of his fraudulent intent. See Rader, 15 Va. App. at 330, 423 S.E.2d at 210. Investigator Reynolds told McCary that he would suspend his investigation if he completed the work on the Botkins' home and obtained a license. McCary informed Reynolds that he would obtain a license. The Commonwealth introduced evidence, however, that neither McCary nor Sudden Housing II ever possessed or obtained a

valid contractor's license. This evidence gives rise to an inference that McCary never intended to complete his projects. Id.

Third, McCary's general lack of communication with the homeowners is probative of fraudulent intent. See id. at 330-31, 423 S.E.2d at 211. McCary was evasive with the Sharps throughout the project. Linda Sharp testified that "[they] would call and [they] were not getting any satisfaction as to when [they] could expect anybody up there to work." McCary also never responded to the Sharps' demand letter, and he did not respond to the demand letter from the Botkins. The trial court could infer from McCary's evasive conduct and failure to communicate that he never intended to complete the contracts. Cf. Boothe v. Commonwealth, 4 Va. App. 484, 486, 491, 358 S.E.2d 740, 742, 745 (1987) (finding no fraudulent intent where defendants remained in contact with clients).

Fourth, McCary's failure to inform the Sharps of his financial difficulties is probative of fraudulent intent. See Norman, 2 Va. App. at 521, 346 S.E.2d at 46. Although McCary sent a letter to the Botkins on April 15, 2000, admitting that his company had a "serious cash flow problem," he proceeded to accept two advances from the Sharps in August 2000 and November 2000 without informing them of his company's financial difficulties. The trial court could infer from this evidence that McCary fraudulently accepted the advances from the Sharps.

Finally, the trial court could infer from McCary's conduct with the Botkins and the Sharps that he engaged in a pattern of fraudulently taking advances. See Hubbard, 201 Va. at 67, 109 S.E.2d at 105. The evidence established that: McCary promised both homeowners he would construct modular homes; he accepted several advances from the homeowners even though little or no work had been completed on the homes; he failed to see the projects through to completion; and he did not return any of the money advanced. Although McCary completed some work on the homes, "[i]t is apparent from reason and common sense that construction fraud

- 8 -

can occur despite the fact that a builder or contractor begins to perform on the contract." Rader, 15 Va. App. at 322, 423 S.E.2d at 212.

Based on the foregoing evidence, we find that the Commonwealth excluded all reasonable hypotheses of innocence and proved beyond a reasonable doubt that McCary acted with fraudulent intent.

### III.  Criminal Agency

McCary further argues that the evidence showed that Sudden Housing II received the advanced payments and that he cannot be criminally liable for the company's actions.  This argument is without merit.

We have held that "where a corporation's business 'involves a violation of the law, the correct rule is that all who participate in it are liable.'"  Compton v. Commonwealth, 22 Va. App. 751, 755, 473 S.E.2d 95, 96-97 (1996) (citations omitted).  Because a corporation acts only through its agents, we cannot allow the corporation to act as a shield if the law is to deter criminal conduct.  Id.  Furthermore, "'[i]f the individual personally engaged in the criminal conduct or directed or permitted its commission, it is no defense that the offense was performed on behalf of the enterprise.'"  Id. (citations omitted).

The evidence, when viewed in the light most favorable to the Commonwealth, establishes that McCary personally engaged in criminal conduct.  He held himself out as agent and general manager of Sudden Housing II.  In his April 2001 letter to the Botkins, McCary signed as "general manager."  Similarly, he signed the Sharps' contract as "President."  He was a signatory on the account and had access to the funds paid by the Botkins and Sharps; after receiving the homeowners' funds, he made many of the deposits.  The evidence further establishes that McCary directed the homeowners as to when and how much money was to be advanced, that he accepted the advances from the homeowners, that he made numerous promises to the

homeowners that went unfulfilled, and that he was the homeowner's main contact at Advance System Builders/Sudden Housing II. Accordingly, we find the trial court properly concluded that McCary obtained the advances from the Botkins and Sharps as required under Code § 18.2-200.1, thus making him criminally liable for fraud.

IV. Adequacy of Notice

A. Address Complied with Statute

McCary next contends that the notice the Botkins sent to him, pursuant to Code § 18.2-200.1, was defective because it contained an incorrect zip code. We find that this argument is without merit.

The relevant portion of the statute provides that the contractor must return the advance "within fifteen days of a request to do so sent by certified mail, return receipt requested, to his last known address or to the address listed in the contract." Code § 18.2-200.1. The statute "requires nothing more than proof that the notice was 'sent by certified mail, return receipt requested to [the] last known address or the address listed in the contract.'" Holsapple v. Commonwealth, 39 Va. App. 522, 534, 574 S.E.2d 756, 761 (2003).

Arguing his motion to strike at the conclusion of the Commonwealth's case, McCary contended that the incorrect zip code invalidated the notice. The trial court considered the issue and found:

> With regard to the Botkin matter and the fact that there is an apparent error initially in the zip code[,] the green card regarding the receipt clearly shows a 22801 address, zip code. And I feel when it's considered as a totality, the requirement, which is to send it the last known address . . . . I think that complies with the requirements of the code section.

- 10 -

McCary made the same argument in closing. The trial court again rejected it and concluded the Botkins gave proper notice.

The trial court's factual findings are supported by the record and are entitled to deference upon review. The Botkins used the correct street address, city, and state. Although the envelope listed the incorrect zip code, the certified mail card correctly listed the zip code. Absent a showing that a similar address at the incorrect zip code existed, the trial court properly concluded the notice was delivered to McCary at Sudden Housing II.[1] See Basile v. American Filter Service, Inc., 231 Va. 34, 38, 340 S.E.2d 800, 802 (1986) (failure to include corporate defendant's zip code does not invalidate service because evidence established omission of zip code could not result in delivery to any location other than the corporation's correct address). Moreover, other courts have held that an incorrect zip code will not invalidate legally required notice. See, e.g., Kahl v. SAIF Corp., 738 P.2d 999, 1000 (Or. App. 1987) (service not defeated by address with incorrect zip code); Zeigler Coal Co. v. Commonwealth Dep't of Revenue, 691 S.W.2d 216, 217-18 (Ky. App. 1985) (incorrect zip code used in notice of tax lien did not preclude address from being proper).

Therefore, we find that the trial court properly concluded that the Botkins' notice was correctly addressed and sent to McCary as required by the statute.

### B. Demand Complied with Statute

Lastly, McCary argues that the notices sent by both homeowners did not comply with the statute because they requested the return of *all* monies paid. This broad demand, McCary maintains, was defective because the homeowners actually received their modular homes.[2] He

---

[1] The notice letter eventually came back to the Botkins as "unclaimed."

[2] Neither home was completed, however.

reasons that they were not, therefore, entitled to a full refund of the money they had advanced. McCary's argument is without merit because the statute does not require that the notice provide a specific accounting of funds due.

The relevant portion of Code § 18.2-200.1 reads: "he shall be deemed guilty of the larceny of such money, merchandise or other thing if he fails to return such advance within fifteen days of a request to do so." On its face, the statute imposes no substantive requirements on the "request to do so." "Where a statute is unambiguous, the plain meaning is to be accepted without resort to the rules of statutory interpretation." Last v. Virginia State Bd. of Med., 14 Va. App. 906, 910, 421 S.E.2d 201, 205 (1992). "'Courts are not permitted to rewrite statutes. This is a legislative function. The manifest intention of the legislature, clearly disclosed by its language, must be applied.'" Barr v. Town & Country Properties. Inc., 240 Va. 292, 295, 396 S.E.2d 672, 674 (1990) (quoting Anderson v. Commonwealth, 182 Va. 560, 566, 29 S.E.2d 838, 841 (1944)). The plain language of the statute reveals that the legislature intended only that the builder or contractor be put on notice of the claim, affording him an opportunity to return the money or otherwise respond to the claim.

Here, the Botkins and the Sharps did all that was required under the statute. They sent McCary demand letters and requested the return of the money they had advanced. The letters were sufficient to place McCary on notice of the homeowners' demands. The letters afforded McCary opportunities to respond. McCary failed to avail himself of the opportunities.

For the reasons stated, we affirm the trial court.

<u>Affirmed.</u>