COURT OF APPEALS OF VIRGINIA


Present:   Judges Frank, Beales and Senior Judge Bumgardner
Argued at Alexandria, Virginia


NETSANET BESHAH

                                                              OPINION BY
v.      Record No. 2070-10-4                    JUDGE ROBERT P. FRANK
                                                              MAY 8, 2012

COMMONWEALTH OF VIRGINIA


                 FROM THE CIRCUIT COURT OF ARLINGTON COUNTY
                              Benjamin N. A. Kendrick, Judge

            Todd F. Sanders (Sanders & Kissler, on brief), for appellant.

            Rosemary V. Bourne, Assistant Attorney General (Kenneth T.
            Cuccinelli, II, Attorney General, on brief), for appellee.


        Netsaneh Beshah, appellant, was convicted of four counts of forgery, in violation of Code

§ 18.2-172.  On appeal, she contends the evidence was insufficient to prove intent to defraud and

prejudice to another.  Appellant also assigns error to the trial court's disqualification of her trial

counsel due to a conflict of interest, and thus, she alleges she is entitled to a new trial.  For the

reasons stated, we affirm.

                                        BACKGROUND

        "On appeal, 'we review the evidence in the light most favorable to the Commonwealth,

granting to it all reasonable inferences fairly deducible therefrom.'"  Archer v. Commonwealth,

26 Va. App. 1, 11, 492 S.E.2d 826, 831 (1997) (quoting Martin v. Commonwealth, 4 Va. App.

438, 443, 358 S.E.2d 415, 418 (1987)).  So viewed, the evidence showed that in 2007 and 2008,

appellant worked as a licensed practical nurse (LPN) at Potomac Center, a Medicaid-certified

skilled nursing facility in Arlington, Virginia.  As part of her duties, appellant was required to

make entries on medical records showing when she administered medications according to

physician's orders and when she performed certain procedures, such as turning and repositioning bed-ridden patients.[1]

All nurses, including appellant, were also required to document the patient's medical chart[2] when medications were not administered, or when a patient refused to take medications. Appellant was also required to record in her nurse's notes when she provided incontinence care or repositioned bed-ridden patients to prevent bedsores. This documentation was required whether the failure to administer the medication was due to nursing error or the patient's refusal of medication or treatment.

J.E., a Medicaid patient, resided at Potomac Center when appellant worked there. J.E. suffered from seizure disorder, dementia with behavior disturbances, bowel problems, and chronic obstructive pulmonary disease (COPD) that caused respiratory deficiencies. Due to his dementia, J.E. was combative and often refused to take his medication. He was characterized as a medical and behavioral "high risk" due to his health problems. Because he was bedridden, J.E. was at high risk for skin breakdown and had to be turned every two hours. His treating physician, Dr. Romaldo DeSouza, prescribed a long list of medications to treat his constipation, COPD, and anxiety. The medications had to be given at certain times during the day.

Dr. DeSouza testified he had not seen any adverse reaction by J.E., even if he had been untimely given medications or even if he had not received his stool medications at all. J.E. had no major bed sores. However, if not given Xanax, J.E. would become more agitated.

---

[1] Appellant had no discretion whether or not to administer scheduled medications.

[2] Physician's orders were transcribed into medical records called medication administration records ("MARs") and treatment administration records ("TARs"). The nurses at the facility recorded the delivery of medications and other treatment in these documents and in the nursing notes. All of these documents were kept in the patient's clinical chart.

Due to J.E.'s wife's concerns that he was receiving improper care, and with her consent, a special agent of the Federal Bureau of Investigation (FBI) installed a covert video surveillance camera in J.E.'s room. The surveillance took place in August and September of 2008. During surveillance, as shown on video, appellant did not administer some medications as prescribed, but she recorded having administered these medications. Appellant also failed to perform nursing care she documented she had performed. Appellant recorded vital signs when she had not taken them, recorded turning and repositioning J.E. when she had not done so, and recorded performing incontinence care when she had not. She fabricated entries in J.E.'s medical records numerous times during the surveillance period. When the FBI agent showed appellant the various medical reports in which appellant had recorded the administration of medications and treatment, appellant indicated the entries were correct.

Dr. Susan Levy, an expert in geriatric medicine, testified that a nurse's failure to accurately record the administration of medication is potentially dangerous, because the physician cannot provide accurate treatment with incorrect information. She testified that it is difficult for a physician to evaluate the patient's treatment plan without good documentation. Physicians rely on the medical records to evaluate whether medications should be increased, discontinued, or whether modes of treatment should be altered.

Dr. Levy indicated that correct documentation of a patient's medication refusal is very important to physicians and that nurses are expected to make notations when medications are not consumed. Refusal to take medication triggers a re-evaluation of the medication regimen. According to Levy, the type of bowel issue J.E. had, chronic ilius, could become "serious very quickly" and required the regular administration of laxatives. Levy explained that regular turning and repositioning for a patient like J.E. was important to prevent pressure ulcers. Pressure ulcers can potentially be fatal. Turning and repositioning also would help to keep J.E.'s

- 3 -

airways open and stimulate bowel function. J.E. was to be repositioned every two hours.
Beyond that time frame, there is an increased risk of skin breakdown.

Evidence further revealed that it is crucial for one shift of nurses to keep accurate records
of a patient's medication administration, treatment, and behavior for the next shift of nurses.
This is particularly true when the patient has cognitive impairment.

Medicaid also uses the patient's clinical records in a formula to determine reimbursement
and to determine whether patients at the facility are receiving the care for which Medicaid is
paying. As a result, Medicaid required Potomac Center to maintain accurate and complete
patient records. In order to comply with regulations and receive reimbursement,[3] an employee at
the Potomac Center would obtain data from the patient's clinical records and send that
information to the Commonwealth of Virginia, which used the records to "ascertain what care an
individual [was] being provided." Sanctions imposed by the Commonwealth and by the federal
Medicaid program, for falsifying clinical records or for failure to provide care to a Medicaid
patient, could result in civil penalties (to include civil malpractice claims), loss of licensure, or
even closure, based on the level of harm.

Assessments based on a patient's medical records are submitted to the Commonwealth to
determine reimbursement rates and quality control. The *per diem* reimbursement rate is based on
a resource utilization group (RUG). The RUG level is based on the amount of care and services
the facility provides each patient. The greater the level of medical services, the greater the RUG
level would be.

A grand jury indicted appellant and a number of other employees of Potomac Center for
crimes involving J.E.'s care. Rod Leffler was retained counsel for six of those employees,

---

[3] Reimbursement is paid at a *per diem* rate and is not based on the individual treatment of
a patient.

including appellant. After a bench trial in March of 2010, the trial court convicted appellant of four counts of forgery. Sentencing was set for May 28, 2010.

By letter dated April 26, 2010, the Commonwealth's attorney offered plea agreements to two of Leffler's other clients, Abdul Sesay and Mamusu Sesay, who had been charged with related conduct involving J.E.'s care at Potomac Center and were awaiting trial. The terms of the plea offers required those clients to cooperate with the Commonwealth and testify against the other defendants, including appellant and four others.

In May of 2010, another of Leffler's Potomac Center clients, Thomas James, was called to testify at a special grand jury after he was acquitted of criminal charges involving J.E.'s care. At that grand jury, the Commonwealth offered James immunity for his testimony.

On May 10, 2010, the Deputy Commonwealth's Attorney filed a notice and motion to disqualify Leffler as counsel due to a conflict of interest. Appellant, by counsel, filed a response asserting no conflict existed and stating she had executed a waiver of any alleged conflict.[4]

At the hearing on the disqualification motion on June 23, 2010, Leffler acknowledged that James had received immunity for his testimony at the grand jury and that Leffler expected that James would testify against some or all of the remaining clients.

At the hearing, Leffler denied any conflict. The Commonwealth's attorney stated, "Mr. James has been, or will be subpoenaed to testify against his colleagues including people represented by [Leffler]." The Commonwealth's attorney then stated, "And I believe one defendant – one of counsel's defendants may well testify against [appellant] in a sentencing hearing. I believe that may be Mr. James on the positioning, repositioning debate."[5]

---

[4] We note that Leffler sought advice from the Virginia State Bar ethics counsel concerning his alleged conflict of interest.

[5] James did not testify at appellant's sentencing.

The trial court expressed concern about a conflict caused by Leffler's representation of multiple clients charged with the same offenses, particularly if one client testified against another, as well as possible plea negotiations. The trial court inquired of Leffler, "and if you're representing five, six or – or I just don't know how you focus laser-like vigorously on one to the exclusion of all others. Tell me how you can do that." Leffler candidly responded, "I don't have an answer for that, Judge, I don't."

The trial court granted the motion to disqualify Leffler in all of the cases arising from the same incidents, including appellant's case. As of the date of the disqualification hearing, some of Leffler's clients had not yet been tried. On August 27, 2010, at the sentencing hearing, new counsel renewed appellant's objection to Leffler's disqualification.

This appeal follows.

## ANALYSIS

### I. Sufficiency

Appellant contends the evidence was insufficient to prove she had the intent to defraud and that there was any prejudice to another.

> "When considering a challenge that the evidence presented at trial is insufficient, we 'presume the judgment of the trial court to be correct' and reverse only if the trial court's decision is 'plainly wrong or without evidence to support it.'" Baylor v. Commonwealth, 55 Va. App. 82, 86, 683 S.E.2d 843, 845 (2009) (quoting Davis v. Commonwealth, 39 Va. App. 96, 99, 570 S.E.2d 875, 876-77 (2002)). "We do not 'substitute our judgment for that of the trier of fact.'" Id. (quoting Wactor v. Commonwealth, 38 Va. App. 375, 380, 564 S.E.2d 160, 162 (2002)). "Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). "This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the

> evidence, and to draw reasonable inferences from basic facts to ultimate facts." Id.

Brown v. Commonwealth, 56 Va. App. 178, 184-85, 692 S.E.2d 271, 274 (2010).

Appellant was convicted of forgery under Code § 18.2-172, which provides that "[i]f any person forge any writing . . . to the prejudice of another's right . . . , [that person] shall be guilty of a Class 5 felony." The General Assembly codified the English common law of forgery when it enacted Code § 18.2-172. See Campbell v. Commonwealth, 246 Va. 174, 182-83, 431 S.E.2d 648, 653 (1993).

At common law, the crime of forgery "is defined as 'the false making or materially altering with intent to defraud, of any writing which, if genuine, might apparently be of legal efficacy, or the foundation of legal liability.'" Fitzgerald v. Commonwealth, 227 Va. 171, 173, 313 S.E.2d 394, 395 (1984) (quoting Bullock v. Commonwealth, 205 Va. 558, 561, 138 S.E.2d 261, 264 (1964)). A document or instrument is one of legal efficacy "where *by any possibility* it may operate to the injury of another." Gordon v. Commonwealth, 100 Va. 825, 829, 41 S.E. 746, 748 (1902) (emphasis added). Therefore, to sustain a conviction under the modern forgery statute, the Commonwealth must prove that the forged or altered document operated to the *actual or potential* prejudice of another. See Muhammed v. Commonwealth, 13 Va. App. 194, 199, 409 S.E.2d 818, 821 (1991) (holding that the "bare possibility" of prejudice is sufficient under Code § 18.2-172).

To prove a forgery under the statute, the Commonwealth was required to prove only that the forged document had the potential to operate "to the prejudice of another." Code § 18.2-172. "'The purpose of the statute against forgery is to protect society against the fabrication, falsification and the uttering of instruments which *might* be acted upon as being genuine.'" Muhammad, 13 Va. App. at 199, 409 S.E.2d at 821 (quoting Mayes v. State, 571 S.E.2d 420, 427 (Ark. 1978)) (emphasis in original).

Appellant challenges the sufficiency of proof only with regards to "intent to defraud" and "prejudice."

> "Intent to defraud" has been defined by this Court as acting "with an evil intent, or with the specific intent to deceive or trick." Campbell v. Commonwealth, 14 Va. App. 988, 990, 421 S.E.2d 652, 653 (1992) (*en banc*), aff'd in part, 246 Va. 174, 431 S.E.2d 648 (1993). Intent "may, and often must, be inferred from the facts and circumstances in a particular case." Ridley v. Commonwealth, 219 Va. 834, 836, 252 S.E.2d 313, 314 (1979). We must "'look to the conduct and representation of the defendant.'" Rader v. Commonwealth, 15 Va. App. 325, 329, 423 S.E.2d 207, 210 (1992) (quoting Norman v. Commonwealth, 2 Va. App. 518, 519, 346 S.E.2d 44, 45 (1986)).

Burrell v. Commonwealth, 50 Va. App. 72, 86-87, 646 S.E.2d 35, 42 (2007).

Appellant contends that even if she failed to accurately document what she did or did not do, such does not prove intent to defraud. She argues there was no proof that she benefitted from her actions.

The Commonwealth responds that the sheer number of false entries (at least 50 documented violations were introduced at trial) is evidence of a fraudulent intent. The Commonwealth points to appellant's experience as an LPN, her training, and her knowledge of Potomac Center's policy of accurate documentation as further evidence of appellant's intent to defraud. We agree.

Here, appellant's failure to accurately document was not an isolated event, but was a pattern of behavior to misrepresent the status of the patient's treatment and medication. See, e.g. McCary v. Commonwealth, 42 Va. App. 119, 129, 590 S.E.2d 110, 116 (2003) (holding, in a construction fraud case, that a pattern of similar behavior was probative of fraudulent intent). The trial court so found in this case. Further, the trial court rejected appellant's trial testimony that her documentation was accurate. Having rejected the credibility of her testimony, the trial court could consider that perjured testimony as additional evidence of appellant's guilt. See

- 8 -

Wright v. West, 505 U.S. 277, 296 (1992); Morris v. Commonwealth, 269 Va. 127, 133-34, 607 S.E.2d 110, 114 (2005) ("And, upon finding Morris's testimony unworthy of belief, the trial judge could draw the reasonable inference that Morris testified falsely 'in an effort to conceal his guilt.'" (quoting Covil v. Commonwealth, 268 Va. 692, 696, 604 S.E.2d 79, 82 (2004))); see also Spangler v. Commonwealth, 188 Va. 436, 438, 50 S.E.2d 265, 266 (1948) (explaining that, when a defendant "proceeds to introduce evidence in his own behalf," the prosecution's case "may be strengthened by defendant's evidence").

Clearly, appellant knew the importance of maintaining accurate medical records, based on her experience and training. She knew the medical repercussions of faulty recordkeeping. She also knew that J.E. had many medical issues requiring the timely administration of medications and other treatment essential to his health.

As to appellant's contention that she had no intent to defraud because she received no benefit from her failures, we find no merit to this argument. It is reasonable for the fact finder to conclude that appellant received the benefit of being paid for work she did not perform and that she benefitted from masking her dereliction of duty.

Next, appellant argues there was no evidence that anyone suffered prejudice. She cites Dr. DeSouza's testimony that J.E. was not affected by appellant's failure to administer medications or reposition him. DeSouza testified he saw no signs of major bed sores.

This argument is flawed because it does not accurately portray the case law. Actual prejudice is not required. As we have already noted, to uphold a conviction under Code § 18.2-172, the evidence must show only the possibility that the forged instrument may operate to the prejudice of another's right. See Gordon, 100 Va. at 829, 41 S.E. at 748; Muhammad, 13 Va. App. at 196-97, 409 S.E.2d at 819-20.

J.E. was an elderly, infirmed patient. He was undoubtedly deprived of necessary medications. According to Dr. Levy, J.E.'s bowel condition could become serious very quickly and required the regular administration of laxatives. Regular turning and repositioning was important to prevent pressure ulcers, to keep J.E.'s airways open, and to stimulate bowel function. Evidence also revealed that failure to maintain accurate medical records compromised the physicians' and nurses' ability to formulate or modify treatment and medication regimens. Clearly, J.E. was exposed to actual and potential prejudice.

Potomac Center was mandated by state and federal Medicaid regulations to maintain accurate medical records. Failure to do so would result in sanctions, ranging from civil penalties to loss of licensure and closure. These facts plainly indicate potential prejudice to the center.

Lastly, falsified records showing treatment performed and medications administered are factors that ultimately determine the level of Medicaid reimbursement. While this reimbursement is on a *per diem* basis, the amount of treatment and medications given to a particular patient are used in a formula to determine the *per diem* reimbursement. Thus, the trial court could properly conclude Medicaid was also prejudiced by appellant's actions.

The trial court did not err in finding the evidence was sufficient to convict appellant of four counts of forgery.

## II. Disqualification

Appellant assigns error to the trial court disqualifying trial counsel because of a conflict of interest in his representation of appellant and five other defendants involved in the care of J.E. Appellant asserts in her last two assignments of error that because any alleged conflict would have existed prior to and during the guilt phase of her trial, she is entitled to a new trial. She further asserts she is entitled to a new trial because one of the bases of the conflict was the

Commonwealth's proffer that it would call one of Leffler's other clients, James. James, however, was not subpoenaed nor called as a witness at appellant's sentencing hearing.

The Supreme Court of the United States explained in Wheat v. United States, 486 U.S. 153 (1988), that "[t]he Sixth Amendment right to choose one's own counsel is circumscribed in several important respects." Id. at 159. The Supreme Court also recognized the trial court's wide latitude in balancing the right to counsel of choice against the needs of fairness, as well as the judiciary's "independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." Id. at 160. The aim of the Sixth Amendment is "to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." Id. at 159.

This Court applied Wheat to Johnson v. Commonwealth, 50 Va. App. 600, 652 S.E.2d 156 (2007). In Johnson, appellant waived a potential conflict from representation by his attorney, who also represented a potential witness against appellant. Counsel had also obtained a waiver from the eyewitness. Nevertheless, the trial court disqualified appellant's attorney and appointed substitute counsel. On appeal, Johnson claimed the trial court violated his Sixth Amendment right to counsel. Citing Wheat, we noted:

> [T]rial courts must be allowed substantial latitude in refusing waivers of conflicts of interest not only in those rare cases where an actual conflict may be demonstrated before trial, but in the more common cases where a *potential for conflict exists* which may or may not burgeon into an actual conflict as the trial progresses. This standard gives trial courts broad latitude because the likelihood and dimensions of nascent conflicts of interest are notoriously hard to predict, even for those thoroughly familiar with criminal trials. It necessarily follows that the trial court has a unique obligation to foresee problems over representation that might arise at trial and head them off beforehand.
>
> Appellate courts must rely heavily on a trial court's instinct and judgment based on experience in making its decision. It

- 11 -

> should be no surprise, then, that different trial courts faced with the similar circumstances would reach opposite conclusions with equal justification, but that does not mean that one conclusion was "right" and the other "wrong." The evaluation of the facts and circumstances of each case under this standard, therefore, must be left primarily to the informed judgment of the trial court. When reasonable jurists could disagree, the trial court's ruling should stand on appeal.

Johnson, 50 Va. App. at 605-06, 652 S.E.2d at 158-59 (emphasis in original).

Johnson is controlling here. In Johnson, we affirmed the trial court and observed "at trial, [counsel] would have found himself in an intractable dilemma; either he could vigorously cross-examine Coleman in an effort to discredit Coleman's sworn testimony, or he could weaken the intensity of cross-examination (perhaps even abandon the effort altogether) out of a desire to protect Coleman." Id. at 606, 652 S.E.2d at 159.

We concluded that "the Sixth Amendment does not 'demand that a court honor [a] waiver of conflict-free representation.'" Id. at 607, 652 S.E.2d at 159 (quoting United States v. Gonzalez-Lopez, 548 U.S. 140, 152 (2006)).[6] "Institutional interest in the appearance, as well as the reality, of propriety cannot be vitiated merely by a client's waiver." Id.

This appeal presents a similar conflict to the one in Johnson. Leffler represented multiple co-defendants, some of whom, as part of a written plea agreement, agreed to testify against other co-defendants. By doing so, Leffler put himself in "an intractable dilemma." As an example, if one of Leffler's clients testified against appellant at sentencing or against any other co-defendant at trial, he would be pitting one client against the other, as the trial court correctly observed. Further, a vigorous cross-examination of that client might be in the best interest of appellant or a co-defendant on trial, but may be injurious to the interests of that witness, such as prosecution for perjury. For example, if a co-defendant testified against appellant, he would satisfy the

_____

[6] Appellant, in her brief, does not argue the effect of her waiver.

- 12 -

conditions of his plea agreement, but would potentially harm appellant's case. If the co-defendant did not testify against appellant, he would violate the conditions of his suspended sentence. Indeed, when asked how he could vigorously focus on one client's interest to the exclusion of the others, Leffler candidly replied, "I don't have an answer for that, Judge, I don't."[7]

As the trial court pointed out, a conflict may arise in negotiating plea agreements for other clients. As with Abdul Sesay and Mamusu Sesay, the Commonwealth may very well insist on testimony against co-defendants. Yet such an agreement would be detrimental to other co-defendants who may then be exposed to damaging testimony.

Appellant next contends that one of the Commonwealth's reasons to move for Leffler's disqualification was that they would call another of Leffler's clients to testify against appellant at sentencing. Because James was neither subpoenaed nor called, appellant reasons that the basis for disqualification never materialized, thus disqualification was in error.

This argument fails for two reasons. First, it is of no moment that James was not called as a witness. The issue is whether, at the time of the disqualification hearing, there was a potential conflict by Leffler's representation of two clients, one of whom may testify against the other. As stated above, the standard is whether "a *potential for conflict* exists which may or may not burgeon into an actual conflict as the trial progresses." Johnson, 50 Va. App. at 605, 652 S.E.2d at 158 (emphasis in original). "[W]e judge the trial court's ruling in light of the circumstances facing it as the time of the pretrial decision to disqualify, not through the lens of hindsight after the trial has come to a close." Id. at 608, 652 S.E.2d at 160.

---

[7] We note that with regard to a potential conflict, Leffler stated to the trial judge, "we respect any decision this Court comes to."

Second, in considering a potential conflict, we do not look at subsequent events. The trial court, in granting the motion, considered Leffler's representation of Abdul Sesay and Mamusu Sesay, as well as possible plea negotiations for other co-defendants. The trial court considered potential conflicts with multiple clients, including James.

Finally, appellant contends if a conflict arose, it arose prior to her trial, when the Commonwealth made an oral offer to one of Leffler's other clients. She asserts that because of the conflict, Leffler should not have represented her at all, and thus the guilty verdict should be set aside. This argument is premised on appellant's assertion that the plea agreements creating a conflict were in place prior to appellant's trial.

However, no evidence, nor proffer, revealed what the earlier oral plea offer encompassed. There was nothing to suggest that any part of the oral offer created a potential conflict, such as one co-defendant testifying against another. Thus, appellant's assertion that a conflict existed prior to appellant's trial is pure speculation.

We note that the written plea offers to Abdul Sesay and Mamusu Sesay, both dated April 26, 2010, were made subsequent to appellant's trial.

We therefore conclude appellant is not entitled to a new trial because there is no evidence a conflict existed prior to appellant's trial.

The trial court did not abuse its discretion in disqualifying Leffler.

## CONCLUSION

For the foregoing reasons, we conclude that the evidence in the record proves beyond a reasonable doubt that appellant is guilty of forgery under Code § 18.2-172. Further, the trial judge correctly disqualified appellant's counsel due to a potential conflict in his representation. Therefore, we affirm the trial court.

Affirmed.