COURT OF APPEALS OF VIRGINIA

Present:   Judges Petty, Malveaux and Senior Judge Annunziata
Argued at Alexandria, Virginia

UNPUBLISHED

CHELIE L. CASSWELL

v.        Record No. 1081-17-4

COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION* BY
JUDGE WILLIAM G. PETTY
JULY 24, 2018

FROM THE CIRCUIT COURT OF STAFFORD COUNTY
Victoria A.B. Willis, Judge

(John M. Spencer; Spencer, Meyer & Kock, PLC, on brief), for
appellant.  Appellant submitting on brief.

Victoria Johnson, Assistant Attorney General (Mark R. Herring,
Attorney General, on brief), for appellee.


Chelie Casswell appeals her conviction of child cruelty pursuant to Code § 40.1-103(A).[1]

On appeal, Casswell argues that the trial court erred because the evidence was insufficient to

establish the requisite criminal negligence for a child cruelty conviction.  For the reason stated

below, we affirm.

BACKGROUND

Chelie Casswell asked Chad Etka if she could babysit Etka's two children, S.E., his

three-year-old daughter, and A.E., his two-year-old son.  Etka agreed.  Etka and Casswell had

met approximately two months before.  Casswell had been to the home many times before Etka

allowed her to babysit; many of the occasions were pool parties where the children either swam

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

[1] Casswell was also charged with involuntary manslaughter in connection with the same
incident but was acquitted of that charge.

in the pool or played in their playroom.  Casswell had two children of her own and three grandchildren.

Before Etka left early the morning of August 13, 2016, Etka told Casswell that there was a heat advisory that day so the children were not to go outside.  The children's playroom in Etka's house had two internal entrances, both of which were blocked by baby gates.  The playroom also had a sliding glass door that led to the back deck.  Stairs connected the deck to a patio area and a kidney-shaped swimming pool that was, at its greatest depth, five feet deep.  When asked whether the children were able to unlock the sliding glass door in the playroom, Etka said, "They were.  I think [S.E.] was able to unlock the sliding glass door."  In light of that, Etka put an old kitchen cabinet-turned-toy-chest in the track of the sliding door so that the door would not open.  Etka told Casswell about the cabinet.  Etka testified he "never once had any problems" with the children getting out of the playroom through the sliding door when he blocked it with the cabinet.  Etka did not block the door before he left on August 13th, however, because Casswell was on the deck smoking when he left.

A few hours after he left, at 10:25 a.m., Etka sent Casswell a text message to check on the children.  Casswell responded at 10:31 a.m., saying she was cleaning up while "they have a tea party."  The records from Casswell's cell phone show that she then spent over ten minutes on two FaceTime calls with her daughter, starting at 10:34 a.m.  There was no further activity on her cell phone until 11:47 a.m., and there was a second lull in cell phone activity from 11:54 a.m. until 12:51 p.m., when Casswell called 911.

Casswell said she and the children played until around 10:30 a.m. when she put both of them down for a nap in the playroom.  However, a neighbor said that she saw two children outside sometime around 10:10 a.m. to 10:30 a.m.  Although Casswell testified that she let the dog out at 10:30 a.m. through the sliding glass door and locked it behind her, she told her social

worker that when she went to get A.E. from the neighbor, the sliding glass door was unlocked and easy to open. Casswell said the children were both asleep by 11:20 or 11:30 a.m. She admitted that S.E. had asked to go swimming that morning. Casswell said that she worked in the kitchen after the children fell asleep and heard a knock on the door. Casswell testified that on her way to answer the door she noticed S.E.'s feet as she slept on the floor in the playroom.

Around noon, two neighbors found A.E. standing in a ditch next to the street with no shoes or shirt on, very sweaty, and crying. It was very hot and humid that day, with temperatures in the nineties. One neighbor called police and took A.E. inside, the other went to Etka's house and knocked on the door while trying to call Etka's cell phone. Etka answered the phone at 12:41 p.m., as Casswell answered the door. Casswell told each neighbor separately that she had fallen asleep. When Casswell returned home with A.E., she found S.E. in the pool and called 911. The officer who responded to the call about A.E. went to Etka's home. S.E. was on the kitchen floor, wet and unresponsive. Casswell was in the kitchen holding A.E. Officer Walker described Casswell as "calm," but "concerned," and "not frantic." Shortly thereafter, emergency medical services arrived and quickly got S.E. and rushed her to the ambulance and to the hospital. Despite the efforts of medical personnel, S.E. was pronounced dead at Stafford Hospital's Emergency Department later that afternoon.

Police testified that there was a direct view from the kitchen into the playroom through a cutout in the kitchen wall; an individual looking out of the cutout into the playroom at an angle can see the sliding glass door. If one stood in the kitchen, he could "very clearly hear" another person come in and out of the sliding glass door, but there was little to no resistance when sliding the glass door open.

Casswell's blood showed no more than "therapeutic levels" of her medications for depression, anxiety, migraines, insomnia, and thyroid deficiency. Although the

Commonwealth's toxicologist testified that the medications had the potential for side effects like sedation, drowsiness, and dizziness, he explained that he could not determine whether Casswell was experiencing side effects while the children were in her care.

The jury found Casswell guilty of child cruelty pursuant to Code § 40.1-103(A) and sentenced her to four years of incarceration. Casswell timely appealed that conviction to this Court.

ANALYSIS

Casswell argues that the evidence was insufficient to establish the requisite criminal negligence for a child cruelty conviction. We disagree.

When considering the sufficiency of the evidence presented below, "we presume the judgment of the trial court to be correct." Davis v. Commonwealth, 39 Va. App. 96, 99, 570 S.E.2d 875, 876-77 (2002) (quoting Broom v. Broom, 15 Va. App. 497, 504, 425 S.E.2d 90, 94 (1992)). Indeed, "[i]n our review of the sufficiency of the evidence, we must affirm the conviction unless the trial court was plainly wrong or the conviction lacked evidence to support it." Parham v. Commonwealth, 64 Va. App. 560, 565, 770 S.E.2d 204, 207 (2015); see also Code § 8.01-680.

Furthermore, we will not "substitute our judgment for that of the trier of fact." Beshah v. Commonwealth, 60 Va. App. 161, 168, 725 S.E.2d 144, 147 (2012) (quoting Brown v. Commonwealth, 56 Va. App. 178, 184-85, 692 S.E.2d 271, 274 (2010)). Instead, we ask "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. (emphasis added) (quoting Brown, 56 Va. App. at 184-85, 692 S.E.2d at 274).

Code § 40.1-103(A) provides, in pertinent part,

> It shall be unlawful for any person employing or having the custody of any child willfully or negligently to cause or permit the

- 4 -

> life of such child to be endangered or the health of such child to be injured, or willfully or negligently to cause or permit such child to be placed in a situation that its life, health or morals may be endangered.

The negligence required to sustain a conviction under this statute is "criminal negligence." In Barnes v. Commonwealth, 47 Va. App. 105, 111, 622 S.E.2d 278, 280-81 (2005) (internal quotations marks omitted), we noted,

> Criminal negligence requires what ordinarily would be called gross negligence, for it involves a reckless or indifferent disregard of the rights of others, under circumstances reasonably calculated to produce injury, or which make it not improbable that injury will be occasioned, and the offender knows, or is charged with the knowledge of, the probable result of his acts.

Given the fact-intensive nature of this inquiry, we have established factors to consider in making the determination of whether criminal negligence was present:

> the gravity and character of the possible risks of harm; the degree of accessibility of the [guardian]; the length of time of the abandonment; the age and maturity of the children; the protective measures, if any, taken by the [guardian]; and any other circumstance that would inform the factfinder on the question whether the [guardian's] conduct was criminally negligent.

Id. at 113, 622 S.E.2d at 282.

Applied to the facts of this case, these factors demonstrate that Casswell's conduct was of such a nature as to support the jury's finding that she was criminally negligent. First, the gravity and character of the possible risk of harm was great. Leaving the sliding glass door in the playroom unsecure meant exposing the children to extreme danger. Not securing the door and allowing the children to go outside unsupervised meant not only exposing them to the extreme heat, but allowing them access to a five-foot-deep swimming pool that was just steps away from their playroom.

Second, the jury could conclude that Casswell failed to supervise the children for more than two hours. The jury believed the neighbor, who saw A.E. and S.E. outside between

10:10 and 10:30 a.m., rather than Casswell who said she was supervising the children inside at the time.[2]  See Burnette v. Commonwealth, 60 Va. App. 462, 476, 729 S.E.2d 740, 746 (2012) ("The credibility of the witnesses and the weight accorded the evidence are matters solely for the fact finder who has the opportunity to see and hear that evidence as it is presented." (quoting Sandoval v. Commonwealth, 20 Va. App. 133, 138, 455 S.E.2d 730, 732 (1995))).  If the children were already outside by 10:30 a.m., then Casswell lied when she said she texted Etka at 10:31 a.m., lied that the children were having a tea party while she was cleaning, lied that she put them down for a nap, lied that they fell asleep around 11:20 or 11:30 a.m., and lied that she saw S.E.'s foot when she went to retrieve A.E.  Clearly Casswell did not know A.E.'s whereabouts when he was outside unbeknownst to her from at least noon, when he was discovered by the neighbor, to about 12:41 p.m. when Casswell retrieved him.  Accordingly, the jury could conclude that the children were either outside, or at least unsupervised, from at least 10:30 a.m. to 12:41 p.m.  Because the playroom and the sliding door could be seen from the kitchen, the jury could find Casswell's failure to supervise the children for more than two hours was more than mere inadvertence.  Accordingly, the length of time Casswell left the children unsupervised supports the jury's finding of criminal negligence.  See also Noakes v. Commonwealth, 280 Va. 338, 347, 699 S.E.2d 284, 289 (2010) (finding it criminal negligence for appellant to put thirty-three-pound dog crate on top of fifteen-month-old child's crib to prevent the child from standing up and then failing to check on the child for three hours).

---

[2] Casswell's own testimony rules out the possibility of the children being outside while under her supervision.  Casswell testified that she did not let the children outside at any point in the morning.  According to Casswell, other than going to the kitchen to get breakfast, the children were in the playroom all morning until they fell asleep.  Although she said she let the dog out of the sliding door at 10:30 a.m., she clarified that the children did not go outside with her.

Third, the age and maturity of the children demonstrate that they required attentive supervision. A.E. was two years old, and S.E. was three years old. Etka testified that he thought S.E. knew how to unlock the sliding door. Although she could unlock doors, she was not mature enough to be left unsupervised. A neighbor testified that when the children were in the yard playing, they were always supervised. S.E. was not allowed to go into the swimming pool without a flotation device. Casswell was aware of S.E.'s age and maturity because she had been to Etka's pool parties and witnessed S.E. in the pool and otherwise. Therefore, the factfinder could infer that the age and maturity of the children required closer attention than what Casswell provided.

Lastly, Casswell took no protective measures to guard against the risk of the children opening the sliding door, going outside, and getting into the pool. S.E. was three years old, knew how to open the sliding glass door, and had stated her desire to go outside and swim. In fact, accepting the facts in the light most favorable to the Commonwealth, the jury could infer that S.E. knew how to move the toy cabinet off of the sliding door tracks because her father testified that he put loud toys in the cabinet so that he could hear the toys "if by chance [the children] decided to move [the cabinet]." Despite that, however, Casswell failed to guard against the risk by securing the door. Not only did Casswell fail to block the door with the cabinet as Etka instructed, but she failed to even lock the door. Casswell told her social worker that when she went to get A.E. from Etka's neighbor, the sliding door was unlocked and easy to open. Thus, the factfinder could infer that the door had been unlocked since Casswell took the dog out at 10:30 a.m. Accordingly, these factors, taken together, support the jury's conclusion that Casswell's conduct was criminally negligent.

Nevertheless, Casswell argues that this Court's decision in Ellis v. Commonwealth, 29 Va. App. 548, 513 S.E.2d 453 (1999), requires us to reverse her conviction. In Ellis, the

appellant left her two daughters, ages two and four, in her apartment alone while she visited an apartment approximately seventy-five yards away from her building. Id. at 551-52, 513 S.E.2d at 455. Sometime before she left, Ellis turned on the gas stove burner to light a cigarette. Id. at 551, 513 S.E.2d at 455. A fire started shortly after Ellis left. Id. at 552, 513 S.E.2d at 455. The children were asleep in a bedroom with the door closed. Id. There was no evidence that Ellis intentionally left the gas stove burner on before leaving her apartment. Id. at 553, 513 S.E.2d at 455. The children were both injured. Id. at 552, 513 S.E.2d at 455. Ellis was convicted in a bench trial of child neglect in violation of Code § 18.2-371.1(A) and of cruelty to children in violation of Code § 40.1-103. Id. at 551, 513 S.E.2d at 454-55.

This Court reversed Ellis's convictions, holding that Ellis's conduct did not amount to criminal negligence. We noted that

> [n]otwithstanding the fire that resulted from her inadvertence [in failing to turn off the gas jet on her stove], the evidence fails to show that [Ellis] acted with the requisite knowledge or callous indifference to the fact that her children were at risk of injury while she left them unattended.

Id. at 557, 513 S.E.2d at 458. The children were *asleep* in a *closed* bedroom when Ellis left to visit a neighbor. Id. There was no evidence that Ellis did not intend to return before the children woke up or that the children often woke up early from naps—there was no *known* risk of danger to the children in the apartment.

Here, unlike in Ellis, the evidence demonstrates that Casswell knew of the dangers likely to occur and failed to eliminate them. Even if Casswell did lock the sliding glass door, as she claimed, she had been warned that S.E. knew how to unlock it. Ellis, on the other hand, left her children unattended after they were asleep in a closed bedroom. Although Ellis inadvertently failed to turn off the gas jet on the stove before leaving the apartment, she was otherwise fully aware of where the children were and what they were doing. Casswell, however, either fell

asleep or discontinued monitoring the children *after* failing to secure the sliding door that led to the pool.[3] Therefore, the known risk analysis from Ellis supports an affirmance.

Furthermore, Casswell knew of the existence of the dangers that could result in the child's death. Before he left, Etka not only told Casswell that the children were not to go outside because of the heat, but he told her that the sliding glass door needed to be secured. Etka explained that the kitchen cabinet-turned-toy-chest needed to be used to block the door. Accordingly, Casswell knew that steps needed to be taken to ensure that the children did not go outside and expose themselves to the perils that arise when children and swimming pools come together. The record is clear that Casswell failed to take such steps. Although she testified that she locked the sliding door after she came in from letting the dog out, both of the children escaped from the room. And, as we noted above, Casswell knew that three-year-old S.E., who was eager to go swimming that day, could unlock the door. Consequently, the factfinder was free to infer that whatever Casswell did, if anything, to prevent the children from getting out, it was not as she was warned or instructed.

Finally, Casswell's knowledge of the probable results of her inaction is laid bare by her testimony that she had been to Etka's house "[m]any times" for pool parties and S.E. and A.E. went to the parties and swam or played in their playroom. The factfinder can rely on common sense to conclude that swimming pools are dangerous to children. Cf. Commonwealth v. Duncan, 267 Va. 377, 386, 593 S.E.2d 210, 215 (2004) (holding it is common knowledge that giving alcohol to a six-month-old baby who had not had any food or liquids for at least seven hours presented a "substantial risk of serious injury or risk of death to the baby"). Here,

---

[3] Although there was evidence that Casswell had a number of medications in her system while she was babysitting, we do not factor that into the analysis because the toxicologist testified that he could not determine whether Casswell was experiencing side effects of the medications at the relevant time.

Casswell knew that a swimming pool was steps away from these children's playroom and that S.E. wanted to go swimming. Accordingly, viewed in the light most favorable to the Commonwealth, the evidence demonstrates that Casswell had the requisite knowledge and consciousness that her lack of supervision would likely result in injury to S.E.

Moreover, the particular facts and circumstances of this case demonstrate that Casswell's conduct was of such a nature as to support the jury's finding that her failure to ensure S.E.'s safety went beyond inattention and inadvertence, but rose to criminal negligence. Casswell knew the probable result of her inaction, and thereby permitted S.E.'s life to be endangered—and, in this case, the result was fatal.

CONCLUSION

For the foregoing reason, the ruling of the trial court is affirmed.

<u>Affirmed.</u>