Present: Hassell, C.J., Keenan, Koontz, Kinser, Lemons, and
Agee, JJ., and Carrico, S.J.

DONOVAN PAYNE MORRIS
                                          OPINION BY
v.  Record No. 032714      SENIOR JUSTICE HARRY L. CARRICO
                                       January 14, 2005
COMMONWEALTH OF VIRGINIA

             FROM THE COURT OF APPEALS OF VIRGINIA

                         INTRODUCTION

     At issue in this appeal is Code § 18.2-308.2, which makes

it a Class 6 felony to knowingly and intentionally possess or

transport a firearm after having been convicted of a felony.

Also at issue is Code § 18.2-282, which makes it a Class 1

misdemeanor to point, hold, or brandish a firearm in such manner

as to reasonably induce fear in the mind of another.[1]

                    PROCEDURAL BACKGROUND

     In a two-count indictment, Donovan Payne Morris (Morris)

was charged with possession of a firearm, to-wit, a flare

pistol, after having been convicted of a felony, and with

brandishing a firearm.  In a bench trial, Morris was convicted

of both offenses and sentenced to five years' imprisonment with

three years suspended on the possession charge and to twelve

months on the brandishing charge.

     One of the judges of the Court of Appeals denied Morris's

petition for appeal.  Morris v. Commonwealth, Record No. 3395-

_____

     [1] Code § 18.2-282 makes it a Class 6 felony to point, hold,
or brandish a firearm on or within 1000 feet of school property.

02-4 (August 5, 2003).  For the reasons assigned in that order, a three-judge panel of the Court of Appeals also denied Morris an appeal.  Morris v. Commonwealth, Record No. 3395-02-4 (October 30, 2003).  We awarded Morris this appeal.

### FACTUAL BACKGROUND

The record establishes that Morris has a string of nine felony convictions dating back to 1977.  With respect to the present offenses, the evidence shows that on June 20, 2002, Peter Molina, an engraver of tombstones, was working in an Alexandria cemetery accompanied by his wife, who was his business partner.  Morris appeared on the scene, dragging a bicycle and smelling of alcohol.  He sat on a tombstone, staring at Molina and his wife, cursing and mumbling.  After about five minutes, Morris looked at Molina's wife and said, "I'd like that."  When Molina asked Morris what he had said, Morris stood up, "raised up his shirt," and "showed [Molina] this gun he had in his waistband."

Because Molina did not know "what the situation was or what the situation could be," he became "worried about" his wife's safety and decided he "needed to get her out of there."  They got into their truck and, as they were leaving the cemetery, they encountered Officer Vincent Omundson of the Alexandria Police Department.

2

Molina told Officer Omundson "there was a man back there with a gun in his waistband." Omundson, armed with a shotgun, found Morris sitting on "a stump or a bucket," drinking beer. When Omundson told Morris to put down his drink and raise his hands, Morris responded by reaching under his shirt, pulling out the flare gun, and throwing it into some grass about twenty-five feet away. After some resistance from Morris, Omundson arrested him and retrieved the flare gun. One "fired round" of ammunition was found in the flare gun and three "loaded rounds" were found on Morris's person.

STANDARD OF REVIEW

In keeping with familiar principles, we will consider the evidence and all reasonable inferences fairly deducible therefrom in the light most favorable to the Commonwealth, the prevailing party below. Dowden v. Commonwealth, 260 Va. 459, 461, 536 S.E.2d 437, 438 (2000). However, since the statutes at issue here are penal in nature, they must be construed strictly against the Commonwealth, and any ambiguity or reasonable doubt as to their meaning must be resolved in Morris's favor. See Ansell v. Commonwealth, 219 Va. 759, 761, 250 S.E.2d 760, 761 (1979). But this does not mean that Morris is entitled to a favorable result based upon an unreasonably restrictive interpretation of the statutes. See id.

3

## Possession of a Firearm

As noted previously, Code § 18.2-308.2 proscribes the possession of a firearm by a convicted felon. While this Code section does not define the term "firearm," we held in Armstrong v. Commonwealth, 263 Va. 573, 562 S.E.2d 139 (2002), that "in order to sustain a conviction for possessing a firearm in violation of Code § 18.2-308.2, the evidence need show only that a person subject to the provisions of that statute possessed an instrument which was designed, made, and intended to expel a projectile by means of an explosion." 263 Va. at 584, 562 S.E. 2d at 145.[2]

Morris was certainly a person subject to the provisions of Code § 18.2-308.2. He contends, however, that the Commonwealth did not prove that a flare gun is a firearm as the latter term is defined in Armstrong, i.e., an instrument which was designed, made, and intended to expel a projectile by means of an explosion.

We disagree with Morris. Detective William Bunney of the Alexandria Police Department was recognized by the trial court

---

[2] The question in Armstrong was whether, in a prosecution for violation of Code § 18.2-308.2, the Commonwealth is required to prove as an element of the offense that the object possessed by the defendant was an "operable" firearm. The Court answered in the negative. 263 Va. at 584, 562 S.E.2d at 145.

4

as "an expert in the field of firearms."[3]  Detective Bunney examined Morris's flare gun and test-fired it, using two of the three rounds of ammunition recovered from Morris's person.

Detective Bunney testified that the flare gun operated "the way it was intended to by the manufacturer, meaning [the] hammer comes back, stays in the locked position until the trigger is pulled and the hammer falls forward, and when it falls forward, the firing pin falls forward of the breech plate so that it will strike the primer of the shell to ignite the primer, to ignite the propellant, to send a projectile downrange."  Detective Bunney explained that the primer is "sort of like a dynamite cap.  It's an initiator of . . . a larger explosion."

Detective Bunney also testified that a round of ammunition identical to that found on Morris's person contains a projectile made up of a metal cap holding a mixture of black powder and paraffin.  The detective said that black powder is an explosive and that it was the cause of "a burnt residue" found inside the empty cartridges of the two rounds of ammunition used in the test-firing.

In the test-firing, Detective Bunney set up a paper target "at the approximately 25 yard line" of the firing range.  When

---

[3] On brief, Morris complains that the trial court improperly allowed Detective Bunney to testify as an expert on several matters in controversy, but Morris has not assigned error to the trial court's action in this respect.  Accordingly, we will not consider the complaint.  Rule 5:17(c).

he pulled the trigger on the flare gun, he "felt a decidable recoil within the firearm" and "[s]moke appeared at the muzzle end." He saw "an object leave the barrel," saw "an object . . . hit the paper [target]," and heard a "metallic object strike a metallic object further downrange." A metal deflection guard was in place "at the further end of the range."

The first time Detective Bunney fired the flare gun, he used only a paper target. The shot traveled through the paper and produced two holes. On the second shot, the detective backed up the paper target with a cardboard target. The shot traveled through the paper and the cardboard and produced two holes. Detective Bunney likened his test-firing of the flare gun with his experience in firing a 12-gauge shotgun "at medium to short distances," where one hole is created in a target by the projectile and one is created by wadding.

Finally, Detective Bunney was asked whether the trigger, hammer, barrel or breech, and firing pin of the flare gun were "consistent or inconsistent with other firearms with which [the detective was] familiar." He answered, "[c]onsistent."

Accordingly, we conclude that the Commonwealth proved that Morris possessed an instrument that was designed, made, and intended to expel a projectile by means of an explosion.[4]

_____

[4] In another case decided by the Court of Appeals while this case was pending, the court held that a "flare gun clearly falls

Morris argues, however, that under Code § 18.2-308.2, the Commonwealth had the burden of proving that he "knowingly and intentionally" possessed a firearm. Citing Staples v. United States, 511 U.S. 600 (1994), Morris states that "[a]n essential element of the crime that must be proved beyond a reasonable doubt is mens rea, scienter, or criminal intent," yet the Commonwealth did not show that he "knew that [his] flare gun was a firearm."

Morris cites a stipulation entered into below stating that flare pistols and flares are sold at a retail store in Alexandria; that these items are not kept under lock and key; that the store has no minimum age of purchase for the items, does not require registration of the items or a waiting period for their purchase, observes no restriction on the sale of the items, and does not require a potential purchaser to produce identification. Morris then says that "[t]here is apparently little to no regulation of who may purchase or possess flare guns in Virginia" and that "[n]o average, reasonable person would ever consider that possession of [a] plastic safety device

---

within the definition of 'firearm' articulated in Armstrong." Quesenberry v. Commonwealth, 41 Va. App. 126, 129, 583 S.E.2d 55, 56 (2003).

that can be purchased with no restrictions and is not otherwise regulated would subject them to criminal liability."[5]

We reject Morris's argument that he did not know a flare gun is a firearm. He admitted in his testimony that he had seen flare guns fired before, and when asked whether he had "any idea that the flare gun was capable of expelling a projectile by means of an explosion," he evaded the question, saying that "to me it's a safety device, you know, of somebody being on a boat, of somebody in trouble . . . to me it ain't no gun." Morris also testified that he had never fired the flare gun, that he had bought it for $10.00 from "this guy on the street" and planned to sell it to "the owner of the graveyard."

Morris has not explained, however, why, if he thought the flare device "ain't no gun," he felt it necessary to try to dispose of the device when Officer Omundson arrived on the scene. Nor has Morris explained how, if he had never fired the

---

[5] Code § 18.2-308.2:2(B)(1) provides for a criminal history check of a person purchasing a firearm from a dealer and requires the person to furnish information relating to his or her identification and residency in Virginia. This Code section defines the term "firearm" in much the same way as we defined the term in Armstrong, and we said we would read the Code section in para materia with Code § 18.2-308.2, the section then under review, "in order to give consistent meaning to the language used by the General Assembly." 263 Va. at 583, 562 S.E.2d at 145. But it should not be implied from our reference to Code § 18.2-308.2:2 in Armstrong that we consider flare guns to come within the ambit of that Code section. Indeed, the Attorney General agrees that "flare guns are not subject to the restrictions set forth in § 18.2-308.2:2."

flare gun, it just so happened that a fired round of ammunition was found in its chamber.  In any event, the trial court was not bound to credit the testimony of Morris, a convicted felon. Indeed, the trial judge said he found Morris's testimony "questionable at the least for a variety of reasons."  And, upon finding Morris's testimony unworthy of belief, the trial judge could draw the reasonable inference that Morris testified falsely "in an effort to conceal his guilt." Covil v. Commonwealth, 268 Va. 692, 696, 640 S.E.2d 79, 82 (2004) (citing Emmett v. Commonwealth, 264 Va. 364, 372, 569 S.E.2d 39, 45 (2002)). See also Black v. Commonwealth, 222 Va. 838, 842, 284 S.E.2d 608, 610 (1981).  The judge could also "consider whatever [he] concluded to be perjured testimony as affirmative evidence of guilt," Wright v. West, 505 U.S. 277, 296 (1992).

Finally, the trial judge found that the flare gun was "obviously . . . intended to be used as a weapon" and that from "the way [the instrument] was used under the facts of this case, it may well be inferred [that Morris knew the flare gun had the characteristics that would make it fall within the statute]." The judge also said:  "I believe the mens rea is there.  He used [the flare gun] for essentially a criminal purpose."  We agree with the trial judge and conclude that the evidence was

9

sufficient to show that Morris knowingly and intentionally possessed a firearm within the intendment of Code § 18.2-308.2.[6]

## Brandishing a Firearm

As noted supra, Morris was charged with pointing, holding, or brandishing a firearm in such a manner as to reasonably induce fear in the mind of another, pursuant to Code § 18.2-282. Morris argues "[t]here was insufficient evidence that [he] pointed, held or brandished the firearm, and there was insufficient evidence that there was reasonable fear in the mind of Peter Molina."

Morris says that although Peter Molina saw the flare gun in Morris's waistband, he never testified that he was in fear of the gun. Morris asserts that Molina, solely out of concern for his wife, insisted that they should leave the area where Morris was sitting. Indeed, Morris states, Molina indicated in his

---

[6] During argument on a defense motion for a new trial, the trial court admitted into evidence "for purposes of appeal" a letter signed by the Chief of the Firearms Technology Branch of the Bureau of Alcohol, Tobacco and Firearms of the United States Department of the Treasury. The letter stated that the flare gun possessed by Morris was not designed as a weapon or to expel a projectile by the action of an explosive and was not a firearm subject to the provisions of 18 U.S.C., Chapter 44, the Gun Control Act of 1968. The trial court also received a written stipulation asked for by defense counsel and agreed to by the Commonwealth's Attorney, "except as to relevance." The stipulation stated that "Doug Craze of the Bureau of Alcohol, Tobacco, and Firearms would testify that a flare gun is not regulated by the BATF." We consider both statements irrelevant. How the BATF interprets the federal statute and decides what is and what is not a firearm is not binding upon this Court, or even persuasive.

testimony that he "may have stayed where he was had his wife not been there."

Morris says further that he "never touched the gun in the presence" of Molina or his wife and there is no evidence that "he pointed the flare gun." Hence, Morris concludes, the evidence is insufficient to support a conviction for brandishing a firearm.

We disagree with Morris. "Brandish" means "to exhibit or expose in an ostentatious, shameless, or aggressive manner." Webster's Third New International Dictionary, 268 (1993). When Morris looked at Ms. Molina, said "[he'd] like that," and then pulled up his shirt to uncover the flare gun, he exhibited or exposed the weapon in a shameless or aggressive manner. And Morris brandished the weapon in such a manner as to reasonably induce fear in the mind of Peter Molina. Although Molina may not have said he was in fear for his own safety, he stated unequivocally that he feared for the safety of his wife, and that is sufficient to prove the "induced fear" element of a conviction for brandishing a firearm under Code § 18.2-282.

CONCLUSION

Finding no error in the judgment of the Court of Appeals, we will affirm the judgment.

Affirmed.