COURT OF APPEALS OF VIRGINIA

Present: Judges Frank, Humphreys and Chafin
Argued at Chesapeake, Virginia

KEITH DANIEL CARTER

MEMORANDUM OPINION[*] BY
v.      Record No. 0177-13-1      JUDGE TERESA M. CHAFIN
MAY 13, 2014

COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF THE CITY OF CHESAPEAKE
Marjorie T. Arrington, Judge

James O. Broccoletti (Zoby, Broccoletti & Normile, on brief), for
appellant.

David M. Uberman, Assistant Attorney General (Mark R. Herring,
Attorney General, on brief), for appellee.

Keith Daniel Carter ("Carter") was convicted by the Circuit Court of the City of

Chesapeake ("circuit court") of one count of trademark infringement in violation of Code

§ 59.1-92.13(B)(2) based on the sale of counterfeit sports jerseys. On appeal, Carter contends

that the evidence presented by the Commonwealth was insufficient to support his conviction.

Specifically, he argues that the circuit court erred by relying on the low prices at which Carter

sold the counterfeit jerseys to establish that he knew or should have known that they were

counterfeit. Carter argues that the Commonwealth failed to present evidence establishing typical

wholesale prices for jerseys similar to those sold by Carter, and, thus, there was no factual basis

supporting the circuit court's determination that Carter was selling the jerseys at a low price. For

the reasons that follow, we affirm the circuit court's decision.

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

UNPUBLISHED

I.  BACKGROUND

"On appeal, 'we review the evidence in the light most favorable to the Commonwealth, granting to it all reasonable inferences fairly deducible therefrom.'" Archer v. Commonwealth, 26 Va. App. 1, 11, 492 S.E.2d 826, 831 (1997) (quoting Martin v. Commonwealth, 4 Va. App. 438, 443, 358 S.E.2d 415, 418 (1987)).  So viewed, the evidence establishes that Carter owned two retail stores located in Chesapeake, Virginia, that sold sports jerseys and other sports products.  Detective Michael J. Fischetti ("Fischetti") of the Chesapeake Police Department became aware that Carter's stores may have been selling counterfeit jerseys.  Consequently, he contacted Robert Hartnett ("Hartnett"), a private investigator working on behalf of professional sports organizations to protect their intellectual property.  Fischetti and Hartnett went to the stores in an undercover capacity and inspected several jerseys that were for sale.  Hartnett believed these jerseys were counterfeit.  Based upon Hartnett's evaluations of the jerseys, Fischetti obtained search warrants for both stores.

Fischetti and other police officers executed the search warrants on May 10, 2011, with Hartnett accompanying them in an advisory capacity.  The first store that the officers attempted to search was closed when they arrived, but Fischetti contacted Carter by phone and informed him of the impending search.  Carter told Fischetti that he was "in line doing business" at the Virginia Beach courthouse, but that he would return to the store when he was finished.  Carter arrived approximately two hours later and explained that he had been stuck in traffic on the interstate.  Carter then told Fischetti that he was with his daughter at a relative's house in Virginia Beach earlier that day, and denied telling him that he was ever at the courthouse.

After Carter arrived, Fischetti spoke with him in the store's office while Hartnett inspected the jerseys he suspected were counterfeit.  Most of the jerseys were on sale for fifty dollars each, but some were on a sales rack bearing a homemade sign advertising that they were

- 2 -

"50% off" their original sales price.  Hartnett identified numerous counterfeit jerseys for sale in the store based on inconsistencies in their holograms and serial numbers and defects in their appearance, such as flawed logos, poor stitching, and discoloration.  Hartnett also used a special laser reader to identify the counterfeit jerseys.  Hartnett identified the counterfeit jerseys to the police, who collected them as evidence.[1]  The police collected 785 counterfeit jerseys from the first store.  Although other sports merchandise was for sale at the store, it appeared to be genuine and was not collected by the police.

When Fischetti asked Carter where he bought the jerseys, Carter told him that he bought them from Big Apple, a sports merchandise wholesaler, for five dollars each.  Hartnett told Fischetti that Big Apple did not sell sports jerseys, and Fischetti confronted Carter with this information.  Carter then claimed that he had purchased the jerseys from three other wholesalers for twenty dollars each.  Before leaving the store, Carter told the officers that he actually paid forty-five dollars each for some of the jerseys.

When Carter left the store's office and saw that the counterfeit jerseys had been collected by the police, he asked Fischetti what happened to his "Texas" jersey, and stated "That's real.  I know that's real."  He told Fischetti that he bought that particular jersey in an airport and that it was his personal jersey and was only on display in the store.  Hartnett told Carter that he agreed with him regarding the authenticity of the jersey and that he placed the jersey at the store's cash register so that it would not accidentally be collected by the police.

Fischetti, Hartnett, and Carter then went to Carter's second store, where Hartnett identified and Fischetti removed an additional 453 counterfeit jerseys.  At the second location, Fischetti learned that Carter also sold sports merchandise at a local flea market.  No additional

---

[1] When Hartnett was unsure whether or not a jersey was counterfeit, he left it on the sales rack.

jerseys were found at the flea market. While investigating this location, however, Carter told Hartnett that he had purchased jerseys from a supplier in Thailand or Taiwan.

Based on Fischetti's investigation, Carter was charged with one count of trademark infringement in violation of Code § 59.1-92.13(B)(2). That statute provides that: "[a]ny person who . . . [k]nowingly and intentionally violates the provisions of § 59.1-92.12 and possesses 100 or more identical counterfeit registered marks or possesses counterfeit items valued at $200 or more, is guilty of a Class 6 felony." Code § 59.1-92.13(B)(2). In turn, Code § 59.1-92.12 provides:

> [A]ny person who . . . uses in a manner likely to cause a consumer confusion, mistake, or deception as to the source or origin of any goods or services, without the consent of the owner of a registered mark, any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of such goods or services . . . shall be [subject to] any and all of the remedies provided in § 59.1-92.13.

At Carter's trial, Hartnett testified regarding the jerseys and his background in the field of intellectual property investigation. Hartnett testified that he had received hundreds of hours of training on identifying counterfeit goods directly from trademark holders such as the National Football League ("NFL") and from other experts within his field. Hartnett testified that authentic Reebok NFL field practice jerseys typically sold for between forty and sixty dollars wholesale and sold for between $125 to $175 retail. Further, Hartnett testified that Mitchell & Ness jerseys, a specialty brand of jerseys of retired players also known as throwback jerseys, typically sold for between $150 and $160 wholesale and sold for $300 retail. Police seized jerseys purporting to be both of these brands from Carter's stores. Carter was selling these jerseys for fifty dollars each. Hartnett testified that, in his experience, counterfeit jerseys are commonly priced at fifty dollars. Hartnett estimated that the value of the jerseys removed from Carter's stores was well in excess of the $200 threshold set forth in Code § 59.1-92.13(B)(2).

Donald Egley ("Egley"), a former manager of one of Carter's stores, also testified at Carter's trial. Egley testified that he questioned Carter about how the store could sell authentic jerseys for fifty dollars each. Egley said that Carter told him that he received discounts based on the volume of jerseys he purchased. Also, Egley testified that Carter assured him that he could recognize counterfeit jerseys because he was affiliated with Reebok and that the jerseys in the store were genuine.

Carter testified in his own behalf that he could sell the jerseys at lower than average prices because he bought them in closeout and distressed lot sales. He claimed that he bought the jerseys for different prices from different wholesalers, and he provided invoices showing that he bought some of the jerseys for as little as $3.33 each. Although he denied buying jerseys from Thailand or Taiwan, he admitted that the owner of one of the wholesale companies from which he bought jerseys lived in Thailand. He paid this individual for the jerseys he purchased by depositing money directly into his bank account. The jerseys arrived in bulk lots, were not individually wrapped, and at times arrived with dirt on them. Occasionally, the jerseys would have obvious flaws, such as discoloration, inverted player names, and inconsistent team names on the same jersey. Carter claimed that customers never questioned the authenticity of the jerseys and that he personally did not know that the jerseys were counterfeit.

Carter denied that he told Fischetti that he was at the Virginia Beach courthouse on the day the warrants were executed. He also denied telling Egley that he was affiliated with Reebok, or that he had special expertise in identifying counterfeit jerseys. Carter also testified that the "Texas" jersey in his store that Hartnett agreed was authentic was actually a St. Louis Rams jersey that he had bought in Georgetown rather than at an airport.

The circuit court held that Carter's testimony was inconsistent and lacked credibility. The circuit court concluded that Carter should have known that the jerseys were counterfeit, and

convicted him of trademark infringement. The circuit court sentenced Carter to serve five years in prison, with all five years suspended, and ordered Carter to pay $10,000 in restitution and forfeit the counterfeit jerseys. Carter appealed this conviction to this Court.

## II. ANALYSIS

When an appellant challenges the sufficiency of the evidence supporting a conviction, "the judgment of the trial court shall not be set aside unless it appears from the evidence that such judgment is plainly wrong or without evidence to support it." Code § 8.01-680. When reviewing the sufficiency of evidence, this Court "must . . . ask whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" Crowder v. Commonwealth, 41 Va. App. 658, 663, 588 S.E.2d 384, 387 (2003) (emphasis in original) (quoting Kelly v. Commonwealth, 41 Va. App. 250, 257, 584 S.E.2d 444, 447 (2003) (*en banc*)). Circumstantial evidence may be more compelling and persuasive than direct evidence, and it is entitled to as much weight as direct evidence when convincing. See Britt v. Commonwealth, 276 Va. 569, 573, 667 S.E.2d 763, 765 (2008). "Circumstantial evidence is not viewed in isolation. 'While no single piece of evidence may be sufficient, the combined force of many concurrent and related circumstances, each insufficient in itself, may lead a reasonable mind irresistibly to a conclusion.'" Commonwealth v. Hudson, 265 Va. 505, 514, 578 S.E.2d 781, 786 (2003) (quoting Derr v. Commonwealth, 242 Va. 413, 425, 410 S.E.2d 662, 669 (1991) (citations omitted)). "[D]irect proof of a fact is not essential if circumstantial evidence proves the same fact and at the same time excludes every reasonable hypothesis to the contrary." Veney v. Commonwealth, 212 Va. 805, 806, 188 S.E.2d 80, 81 (1972).

The evidence presented in this case supports Carter's conviction of trademark infringement in violation of Code § 59.1-92.13(B)(2). The circumstances of the case establish that Carter knowingly and intentionally sold counterfeit jerseys bearing the registered marks of

several professional sports organizations without their permission. Although Carter claimed that he was unaware that the jerseys were counterfeit, the evidence presented supports the circuit court's conclusion that he was aware of their counterfeit nature. Carter told Egley that he could recognize counterfeit jerseys because he was affiliated with Reebok, and he told Hartnett that he knew the "Texas" jersey was real. Further, the prices at which Carter bought and sold the jerseys, the sources through which the jerseys were obtained, the obvious flaws in the jerseys, and Carter's inconsistent statements throughout the investigation establish that he knew the jerseys were counterfeit when he sold them as genuine, licensed apparel.

Carter bought and sold the jerseys in question at prices well below typical wholesale and retail prices. Carter told Fischetti and Hartnett that he paid as little as five dollars for each jersey that he bought. At trial, he provided invoices showing that he had paid $3.33 for some of the jerseys. A patently low purchase price can imply that the purchaser knows that the purchased goods are not genuine. See Shaver v. Commonwealth, 30 Va. App. 789, 801, 520 S.E.2d 393, 399 (1999) (holding in the context of a prosecution for receiving stolen property that "[t]he fact that a defendant paid a patently low price for property is a circumstance from which a trier of fact may infer guilty knowledge"). Further, Carter sold the jerseys at a price significantly lower than their average retail price. Hartnett testified that authentic Reebok NFL field practice jerseys were typically sold for $125 to $175 by retail sellers and that authentic Mitchell & Ness jerseys typically sold for $300 at retail. Carter, however, sold these jerseys for fifty dollars each. Comparable to a patently low purchase price, a patently low sales price can demonstrate that the seller is aware that the goods for sale are not genuine. See Milteer v. Commonwealth, 267 Va. 732, 741, 595 S.E.2d 275, 280 (2004) (counterfeit CDs and videocassettes sold at prices significantly lower than retail prices).

Carter argues that the Commonwealth did not present sufficient evidence to establish the average wholesale prices of the jerseys. A review of the record, however, shows that this argument is without merit. Hartnett testified that authentic Reebok NFL field practice jerseys typically sold for between forty and sixty dollars wholesale and that Mitchell & Ness jerseys typically sold for between $150 and $160 wholesale. Although Hartnett could not provide additional details concerning the wholesale prices of the jerseys due to variations in pricing among the various professional sports organizations and particular wholesalers,[2] he provided specific estimates for the brands of jerseys sold by Carter. Based on these estimates, the circuit court could conclude that Carter was buying and selling his jerseys at prices that were significantly lower than those typically encountered in both the wholesale and retail markets.

In addition to the low prices at which Carter bought and sold the jerseys, other evidence supports the circuit court's conclusion that Carter knew the jerseys were counterfeit. Although some of the jerseys in question appeared authentic, others had obvious flaws in their quality and design. Hartnett testified that some of the jerseys were discolored and had poor stitching. He also testified that other jerseys displayed shades of colors that did not match those of their respective teams, while others displayed flawed logos. Carter testified that he had received jerseys with more blatant flaws in the past. On one occasion, Carter received jerseys on which the players' names were printed upside-down. On another occasion, Carter received a jersey displaying the names of two different teams. These frequent, obvious flaws should have alerted Carter that the jerseys were not genuine.

Further, Carter purchased the jerseys through questionable sources. Although he later denied making the statement, Carter told Fischetti and Hartnett that he received the jerseys from

---

[2] Hartnett also claimed that the wholesale pricing systems used by the various professional sports organizations constituted proprietary information.

Thailand or Taiwan. At trial, Carter admitted that the owner of one of the wholesale companies from which he bought jerseys lived in Thailand and that he paid this individual for the jerseys he purchased by depositing money directly into his bank account. The jerseys arrived together in bulk lots and were not individually wrapped or packaged. Combined with the low prices and frequent flaws in the jerseys, Carter should have suspected that the jerseys were counterfeit under these circumstances.

Carter's conduct during the investigation also indirectly supports the circuit court's conclusion that he knew the jerseys were counterfeit. "The credibility of the witnesses and the weight accorded the evidence are matters solely for the fact finder who has the opportunity to see and hear that evidence as it is presented." Sandoval v. Commonwealth, 20 Va. App. 133, 138, 455 S.E.2d 730, 732 (1995). "In its role of judging witness credibility, the fact finder is entitled to disbelieve the self-serving testimony of the accused and to conclude that the accused is lying to conceal his guilt." Marable v. Commonwealth, 27 Va. App. 505, 509-10, 500 S.E.2d 233, 235 (1998).

Carter gave numerous inconsistent statements throughout the course of the investigation. When Fischetti asked Carter where he bought the jerseys, Carter told him that he bought them from Big Apple. When Fischetti told him that Big Apple did not sell jerseys, Carter said that he bought the jerseys from three other wholesalers. Likewise, Carter gave inconsistent statements concerning the prices he paid for the jerseys. Initially, he told Fischetti that he paid five dollars for each jersey, then he told Fischetti that he paid twenty dollars for each jersey, and he finally told him that he paid forty-five dollars for some of the jerseys. Carter also denied that he told Egley that he was affiliated with Reebok, or that he had special expertise in detecting counterfeit jerseys.

Carter even gave inconsistent statements concerning questions unrelated to the investigation. He told Fischetti that he was at the Virginia Beach courthouse conducting business when Fischetti initially attempted to execute the warrant when he was actually at a relative's house. Although he referred to a "Texas" jersey when the police were searching his store, at trial he claimed that this jersey was a St. Louis Rams jersey. While he told Hartnett that he had bought this jersey at an airport, at trial Carter testified that he bought the jersey in Georgetown.

Due to Carter's numerous contradictory and inconsistent statements, the circuit court found his testimony incredible. The circuit court specifically found that Carter had been dishonest with the court, and did not believe him when he claimed that he did not know that the jerseys in question were counterfeit. Upon finding Carter's testimony unworthy of belief, the circuit court could draw the reasonable inference that Carter testified falsely in an effort to conceal his guilt. See Morris v. Commonwealth, 269 Va. 127, 133, 607 S.E.2d 110, 114 (2005).

In summary, the evidence presented was sufficient to support Carter's conviction of trademark infringement in violation of Code § 59.1-92.13(B)(2). The evidence established that Carter knew that the jerseys he was selling were counterfeit. Carter bought and sold the jerseys for low prices, and many of the jerseys had obvious flaws. Further, Carter purchased the jerseys through a questionable source. Due to Carter's inconsistent statements, the circuit court found his testimony incredible. Upon doing so, the circuit court could infer that Carter was lying to conceal his guilt. Accordingly, we affirm the circuit court's decision.

Affirmed.