COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:   Chief Judge Decker, Judges Beales and Raphael
Argued at Norfolk, Virginia


JACOB ALEXANDER MEADOWS

                                                    MEMORANDUM OPINION* BY
v.        Record No. 1096-22-1                      JUDGE RANDOLPH A. BEALES
                                                    MARCH 19, 2024

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF VIRGINIA BEACH
Steven C. Frucci, Judge[1]

        James O. Broccoletti (Zoby & Broccoletti, P.C., on brief), for
        appellant.

        David A. Mick, Assistant Attorney General (Jason S. Miyares,
        Attorney General, on brief), for appellee.


        Jacob Alexander Meadows was convicted of contempt in the Circuit Court of the City of

Virginia Beach.[2]  On appeal, Meadows challenges the sufficiency of the evidence supporting his

conviction for contempt.  Meadows also argues that the trial court's final sentencing order was

invalid because the order did not identify which subsection of Code § 18.2-456(A) Meadows

violated.

                                    I.  BACKGROUND

        "In accordance with familiar principles of appellate review, the facts will be stated in the

light most favorable to the Commonwealth, [as] the prevailing party at trial."  *Gerald v.*

---

* This opinion is not designated for publication.  *See* Code § 17.1-413(A).

[1] The Honorable Steven C. Frucci presided over the proceedings below.  Now a member
of this Court, Judge Frucci took no part in this decision.

[2] Although the trial court convicted Meadows of indirect contempt, the final sentencing
order references Code § 18.2-456, the statute governing direct contempt.

*Commonwealth*, 295 Va. 469, 472 (2018) (quoting *Scott v. Commonwealth*, 292 Va. 380, 381 (2016)). "This principle requires us to 'discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom.'" *Kelley v. Commonwealth*, 289 Va. 463, 467-68 (2015) (quoting *Parks v. Commonwealth*, 221 Va. 492, 498 (1980)).

The parties stipulated in the trial court that on December 11, 2018, C.R. went to a house in Virginia Beach to buy marijuana.[3] Meadows was inside the house and saw C.R. pull out a revolver during the marijuana deal. C.R. then attempted to flee from the house, and Meadows chased after C.R. Meadows drew his handgun and fired eight rounds as C.R. tried to run away. C.R. was struck multiple times in his head, neck, back, and pelvis, and C.R. died from his injuries. Meadows then fled from the house, and he was later arrested by police. During his interview with police, Meadows confessed to shooting C.R.

Meadows was charged with the following crimes: second-degree murder; use of a firearm in the commission of a felony; two counts of possession with the intent to distribute more than one-half ounce but less than five pounds of marijuana; two counts of conspiracy to distribute marijuana; and possession, distribution, or intention to distribute a schedule I or II controlled substance, imitation controlled substance, or marijuana on school property. On July 11, 2022, Meadows appeared with his attorney before the trial court and pleaded guilty to voluntary manslaughter in connection with the death of C.R.[4] As part of his plea agreement, the Commonwealth agreed to *nolle prosequi* some of Meadows's other related charges, including

---

[3] We use the initials of the victim, who was a minor at the time of his death, in an attempt to better protect his privacy.

[4] Meadows also pleaded guilty to two counts of possession with the intent to distribute more than one-half ounce but less than five pounds of marijuana and one count of conspiracy to distribute marijuana.

second-degree murder and use of a firearm in the commission of a felony — and also agreed to a maximum of seven years of active incarceration.

Security camera footage of the courtroom showed that during Meadows's plea hearing, Meadows's family and supporters were seated on one side of the courtroom while C.R.'s family and supporters were seated on the other side of the rather small courtroom. Counsel for Meadows presented Meadows's guilty plea through this plea agreement to the trial judge, and the trial judge agreed to allow Meadows to remain out of custody on bond after the hearing. The trial judge took the matter of Meadows's plea agreement under advisement before ending the hearing. The courtroom video then showed that Meadows and his family exited the courtroom while C.R.'s family waited and remained on their side of the courtroom. Gina Lee, the girlfriend of C.R.'s father, testified that she was sitting with C.R.'s family in the courtroom during Meadows's plea hearing. Lee recalled that "when I saw him [Meadows] walking out, he had a smirk smile on his face."

Footage from the courthouse security cameras showed that when Meadows and his family exited the courtroom, they proceeded down the hallway, passed through a double doorway, turned to the right, and then disappeared around the corner toward the descending escalator beyond the view of the courtroom entrance. Approximately 30 seconds after Meadows and most of his family had left the courtroom — and with Meadows out of sight — C.R.'s brother, Robert Ross, and the rest of C.R.'s family filed out of the courtroom. Tyler Meadows, who had been holding the door to the courtroom open first for his family and then for C.R.'s family as they all exited the courtroom, then walked away from the courtroom entrance to catch up to Meadows and their family while Ross and his family gathered in the hallway right outside the courtroom.

Ross testified to his state of mind after Meadows's plea hearing, stating,

> I was emotional thinking about the loss of my brother [C.R.] and that I don't feel like everything is going well and stuff like that. It didn't seem like it was fair to my family; so it was a lot of emotions going on. It was a lot going on and things like that.

When asked if he had had a close relationship with his slain younger brother, Ross replied, "Very close. It was my four brothers grew up together. Same mom, same dad. Did everything together." Ross acknowledged that, during Meadows's earlier bond hearing in January 2020, Ross had stormed out of the courtroom when the trial judge had granted Meadows bond, prompting the trial judge to summon Ross back for further discussion.[5] Ross apologized to the trial judge for his behavior at that time.

Ross then recounted that he "wandered off down the hallway just a little bit to get a little fresh air 'cause everybody was talking, but we were all still in that same area." As Ross reached the double doorway — the same double doorway that Meadows and his family had passed through before walking toward the descending escalator that led to the courthouse exit — Ross encountered Meadows returning to the double doorway. Moments before, Meadows had crossed paths with his brother, Tyler, who was now walking down the hall away from the courtroom and toward the descending escalator in the same direction that his family had just taken. Footage from the courthouse security cameras showed that Meadows was then alone as he walked back toward the courtroom.

---

[5] A different judge presided over Meadows's bond hearing in January of 2020.

Ross further testified, "When I walked through that doorway, at first it was clear and nobody was over there. I didn't want to be around anybody and stuff like that because a lot of emotions going on; and then I see him [Meadows] come around the corner."[6] Ross then recalled:

> We made eye contact. It was a little smirk to the face. It felt very disrespectful to me and my family, and he started to approach me. I felt uncomfortable with that. He continued approaching me down the hallway where me and my family was at.
>
> I didn't see any of his side, lawyers, family or anything like that. It didn't feel like there was any need to come over there.
>
> And there was a pillar over there. Went around the pillar. He was still coming that way. Didn't seem like he tried to go the other way or any kind of way or fall back or anything like that. Just kept coming towards our way. And then it got real emotional.

In addition, Ross remembered that he told Meadows, "You are walking up on me."[7] Ross acknowledged that Meadows did not respond to his statement. Ross became visibly emotional and had to be physically restrained by his family members, who were still gathered in the hallway outside of the courtroom. Ross explained that he did not expect to encounter Meadows at the double doorway, stating:

> 'Cause that's why we let them leave the courtroom first. We stayed in the courtroom. We didn't want to be around them. We didn't want to see anybody. We thought that area was clear just me and my family.

Courthouse security cameras captured the melee as numerous courthouse deputies rushed from different parts of the courthouse and from the courtrooms where they had been posted —

---

[6] The brief encounter between Meadows and Ross was partially recorded on courthouse security cameras, but the column between the double doors blocked the cameras' view of Meadows's face as he encountered Ross.

[7] Meadows testified in his defense at his contempt hearing that he doubled back towards the courtroom because he remembered that his attorney "Mr. Broccoletti had asked me to talk to him; so I turned around and was walking back towards the courtroom." Meadows denied smiling or smirking at Ross.

including the very same courtroom where Meadows had just pleaded guilty to killing Ross's younger brother, C.R. — to address the sudden situation in the hallway. Several of the deputies had to escort the visibly distraught Ross and his agitated family members down the hallway and away from the double doorway. Meadows testified that he "just stood there" in the hallway outside the double doors watching as Ross was being restrained by his family members and then as Ross and his family were being escorted by the courthouse deputies in the opposite direction down the hallway. Meadows's family then also returned to where Meadows was standing and then began to usher Meadows away from Ross and his family. The security footage showed that Meadows continued facing in the direction of Ross and his family for about 15 seconds before turning and moving to the opposite end of the hallway. Meadows, his parents, and another family member then stood at the opposite end of the hall, with Meadows remaining in view as he faced in the direction of the fracas. The disturbance continued as a female member of C.R.'s family appeared to yell in Meadows's direction and was intermittently restrained by another family member before the woman was eventually approached by a sheriff's deputy. During the same time period, 12 deputies had arrived in the hallway to provide assistance, at least two of whom had entered the hallway running. While a group of deputies stood near Meadows and his family members, Ross was visible at the opposite end of the hallway — also in the company of a number of deputies. Several courthouse deputies then escorted Meadows and his family out of the courthouse.

After learning about the disturbance that had taken place in the hallway just outside of his courtroom, the trial judge issued a show cause order to Meadows on July 12, 2022, directing him to appear before the trial court on July 18, 2022, "to show cause why he should not be held in IN-DIRECT CONTEMPT for the actions taken outside of the courtroom on July 11, 2022." The show cause order further stated, "At the conclusion of the hearing, after exiting the courtroom,

the defendant allegedly smirked at the victim's family, which caused an altercation in the hallway."

At the beginning of Meadows's contempt hearing, the trial court announced that Meadows had been charged with indirect contempt and recounted that a show cause had been issued, giving Meadows notice of the contempt hearing. The trial judge detailed that after counsel for Meadows presented his plea agreement, Meadows "walked out. There was a scuffle, disturbance in the hallway. There were a lot of court resources utilized to address it." The trial judge recalled that he had issued a show cause after receiving "information that it was the defendant [Meadows] who was the catalyst for the scuffle." The trial judge also noted that the courthouse alarm system had been activated, which "somewhat interrupted the procedures of the court." The trial court then heard witness testimony — including Meadows's own testimony — and counsel for Meadows presented evidence on Meadows's behalf. Meadows was represented by counsel throughout the contempt proceeding.

After watching the courthouse video footage and hearing witness testimony, the trial judge found that although Meadows "didn't walk up on Mr. Ross on purpose," Meadows "kept going" and was "certainly determined to stay in that space." The trial judge remarked, "It was incredibly unwise to come back. There's procedure. The victim's family was waiting for the defendant [Meadows] and his people to leave." The trial judge went on to find, "There's a history with Mr. Ross who's the brother who is grieving in this case; so why he [Meadows] would come back I don't know." The trial judge also determined that Ross's "problem slamming doors in the past" gave Meadows "knowledge that there's volatility and grieving family members as a result of him [Meadows] killing their family member." Meadows's father, Jay Meadows, also testified and noted that he was present in January 2020 at his son's bond hearing when Meadows was granted bond and everyone witnessed Ross's volatile emotional

reaction afterwards at that earlier bond hearing. Jay Meadows testified, "The same young man stormed -- pushed the door open, both doors; and the judge said, These two [Meadows and Ross] are going to change places."

The trial judge clarified that Meadows's acts on July 11, 2022, of coming back toward the courtroom and encountering Ross in the hallway were not contemptuous acts by themselves. However, "what's telling to the court is the behavior of the defendant [Meadows] when Mr. Ross is restrained. And that behavior is looking straight at him [Ross], not changing his [Meadows's] gait, walking towards the area where Mr. Ross is." The trial judge reiterated that Meadows's contemptuous behavior — which the trial judge described as "abhorrent to the court" — "begins with the instant encounter in that doorway, and it did not end after Mr. Ross was restrained. The behavior continued, and that's what gave rise to the eruption of everyone -- of the ruckus." The trial judge found that "any reasonable recipient who has had a family member killed by the defendant [Meadows] who witnesses this would react violently." The trial judge then also found that Meadows "was smirking and walking towards Mr. Ross" and that Meadows's behavior "was calculated to lead to violent reaction in the recipient; and for that reason I find him in contempt." Meadows now appeals his conviction for contempt to this Court.

## II. ANALYSIS

### A. Sufficiency of the Evidence

Meadows argues on appeal to this Court, "The trial court erred in finding the Appellant guilty of Contempt of Court because the evidence was insufficient as a matter of law because the evidence did not show that Appellant disrupted the administration of justice, nor did it show that the Appellant intended to disrupt the administration of justice."

"When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is "plainly wrong or without evidence to

support it.'"'" *Secret v. Commonwealth*, 296 Va. 204, 228 (2018) (alteration in original) (quoting *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017)). "In such cases, '[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Id.* (alteration in original) (quoting *Pijor*, 294 Va. at 512). "Rather, the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Williams v. Commonwealth*, 278 Va. 190, 193 (2009) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

The Supreme Court has stated, "It has long been recognized and established that a court is invested with power to punish for contempt." *Scialdone v. Commonwealth*, 279 Va. 422, 442 (2010) (quoting *Higginbotham v. Commonwealth*, 206 Va. 291, 294 (1965)). "A court has discretion in the exercise of its contempt power." *Petrosinelli v. People for the Ethical Treatment of Animals, Inc.*, 273 Va. 700, 706 (2007). Thus, "we review the exercise of a court's contempt power under an abuse of discretion standard." *Id.* (citing *Tonti v. Akbari*, 262 Va. 681, 687 (2001)). "Where the court's authority to punish for contempt is exercised by a judgment rendered, its finding is presumed correct and will not be reversed unless plainly wrong or without evidence to support it." *Brown v. Commonwealth*, 26 Va. App. 758, 762 (1998).

It is important to consider the unique contours of the crime of contempt of court. "Contempt is defined as an act in disrespect of the court or its processes, or which obstructs the administration of justice, or tends to bring the court into disrepute." *Epps v. Commonwealth*, 47 Va. App. 687, 708 (2006) (*en banc*) (quoting *Carter v. Commonwealth*, 2 Va. App. 392, 396 (1986)). "Any act which is calculated to embarrass, hinder, or obstruct the court in the administration of justice is contempt." *Kahn v. McNicholas*, 67 Va. App. 215, 225-26 (2017) (quoting *Carter*, 2 Va. App. at 396). "A contempt of court may be direct or indirect. Generally, a direct contempt is one committed in the presence of the court. An indirect or constructive

contempt is one that has occurred outside the presence of the court." *Gilman v. Commonwealth*, 275 Va. 222, 227 (2008) (citations omitted). "[U]nless the contempt is 'committed in open court,' due process 'requires that the accused should be advised of the charges and have a reasonable opportunity to meet them by way of defense or explanation.'" *Scialdone*, 279 Va. at 444 (quoting *Cooke v. United States*, 267 U.S. 517, 537 (1925)). "This opportunity includes 'the assistance of counsel, if requested, and the right to call witnesses.'" *Id.* (quoting *Cooke*, 267 U.S. at 537).

This Court has previously held that "specific intent is not required and that willfulness or recklessness will support a finding of criminal contempt." *Abdo v. Commonwealth*, 64 Va. App. 468, 477 (2015); *see also Singleton v. Commonwealth*, 278 Va. 542 (2009). Significantly, this Court has often stated, "Intent is a factual determination, and a trial court's decision on the question of intent is accorded great deference on appeal and will not be reversed unless clearly erroneous." *Towler v. Commonwealth*, 59 Va. App. 284, 297 (2011) (citing *Robertson v. Commonwealth*, 18 Va. App. 635, 639 (1994)). "Intent may be, and most often is, proven by circumstantial evidence and the reasonable inferences to be drawn from proven facts." *Viney v. Commonwealth*, 269 Va. 296, 301 (2005); *see also Secret*, 296 Va. at 228-29 ("'Intent is the purpose formed in a person's mind and may, like any other fact, be shown by circumstances,' including the 'words or conduct' of the alleged offender." (quoting *Commonwealth v. Herring*, 288 Va. 59, 75 (2014))). Furthermore, the Supreme Court has stated, "It is permissible for the fact finder to infer that every person intends the natural, probable consequences of his or her actions." *Commonwealth v. Perkins*, 295 Va. 323, 330 (2018) (quoting *Ellis v. Commonwealth*, 281 Va. 499, 507 (2011)).

In this case, the trial judge, after watching the courthouse security camera footage and hearing witness testimony, found that Meadows "was smirking and walking towards Mr. Ross."

The judge emphasized that "what's telling to the court is the behavior of the defendant [Meadows] when Mr. Ross is restrained. And that behavior is looking straight at him [Ross], not changing his [Meadows's] gait, walking towards the area where Mr. Ross is." The trial judge further found that Meadows's behavior "was calculated to lead to violent reaction in the recipient; and for that reason I find him in contempt."

The record demonstrates that the encounter between Meadows and Ross occurred inside the courthouse very near the courtroom where Ross and his family members had just witnessed Meadows plead guilty to the brutal killing of Ross's younger brother, C.R. The encounter also followed counsel for Meadows presenting a plea deal that, if approved by the trial court, would have had some of Meadows's other charges dismissed and his sentence capped at seven years of active incarceration. Ross testified that Meadows made eye contact with him, smirked at him, and approached him in the hallway near the courtroom following this plea hearing on July 11, 2022. The security camera footage and Meadows's own testimony furthermore established that Meadows stood basically stationary in the hallway near the double doorway and continued to watch the fracas unfold as Ross's family restrained Ross, lifted him, and physically carried him away and as courthouse deputies rushed out to the hallway and then escorted a visibly upset Ross and his family members away from Meadows.

(Meadows is in the foreground facing Ross and his
family members, who are in the background.)





(Meadows is in the foreground on the right.)

Meadows stood there and just stared at Ross and his family members for nearly a full 15 seconds and only began to truly move away from the fracas once prompted to do so by Meadows's own family members when they arrived to retrieve him. Accordingly, the trial judge concluded, "Even in that brief instance, that's enough for me to find that his [Meadows's] behavior was calculated to lead to violent reaction in the recipient; and for that reason I find him in contempt."

As noted *supra*, after hearing testimony in the case and viewing the security camera footage of the confrontation, the trial court then accepted Robert Ross's testimony that Meadows made eye contact with him as Meadows walked toward him and then smirked at him, prompting Ross's reaction. *See Marable v. Commonwealth*, 27 Va. App. 505, 509 (1998) ("The credibility of a witness and the inferences to be drawn from proven facts are matters solely for the fact finder's determination."). As the trial judge explained and found, "I think any reasonable

recipient who has had a family member killed by the defendant [Meadows] who witnesses this would react violently."

Furthermore, in accepting Ross's testimony, the trial court implicitly rejected Meadows's self-serving testimony that he did not smile or smirk at Ross, and the trial court implicitly found that Meadows was lying to conceal his guilt. *See id.* at 509-10 ("In its role of judging witness credibility, the fact finder is entitled to disbelieve the self-serving testimony of the accused and to conclude that the accused is lying to conceal his guilt."). In *Armistead v. Commonwealth*, 56 Va. App. 569 (2010), this Court stated:

> [T]he trial court, sitting as factfinder, was at liberty to discount [the defendant's] self-serving statements as little more than lying to "conceal his guilt," *Coleman v. Commonwealth*, 52 Va. App. 19, 25 (2008) (citation omitted), *and could treat such prevarications as "affirmative evidence of guilt," id.* (quoting *Wright v. West*, 505 U.S. 277, 296 (1992)). This principle naturally follows from the broader observation that "whenever a witness testifies, his or her credibility becomes an issue." *Hughes v. Commonwealth*, 39 Va. App. 448, 462 (2002) (citation omitted).

*Id.* at 581 (emphasis added); *see Morris v. Commonwealth*, 269 Va. 127, 133-34 (2005) ("[U]pon finding [the defendant's] testimony unworthy of belief, . . . [t]he judge could . . . 'consider whatever [he] concluded to be perjured testimony as affirmative evidence of guilt.'" (final alteration in original) (quoting *Wright*, 505 U.S. at 296)).

Despite the dissent's assertion that we are relying only on the trial judge not believing Meadows's testimony to find sufficient evidence, there is considerable evidence of his guilt here. In deciding this case on appeal, we are mindful of the Supreme Court's command that when reviewing the sufficiency of the evidence, "we eschew the divide-and-conquer approach, which examines each incriminating fact in isolation, finds it singularly insufficient, and then concludes that the sum of these facts can never be sufficient. Instead, in an appellate sufficiency review, the evidence is 'considered as a whole.'" *Commonwealth v. Barney*, ___ Va. ___, ___ (Mar. 16,

- 14 -

2023) (quoting *Stamper v. Commonwealth*, 220 Va. 260, 273 (1979)). "This approach recognizes that 'while no single piece of evidence may be sufficient, the combined force of many concurrent and related circumstances . . . may lead a reasonable mind irresistibly to a conclusion.'" *Id.* at ___ (alteration in original) (quoting *Commonwealth v. Moseley*, 293 Va. 455, 463 (2017)). Here, in addition to (1) the trial court's findings of fact explaining why Meadows had the necessary intent; (2) Ross's testimony, which the trial court believed; and (3) the testimony of Meadows's father, the trial court *also* simply did not believe Meadows's own testimony. The trial court implicitly found that Meadows was lying to conceal his guilt, and that finding constituted *further* evidence that the trial court could *also* consider in concluding that the overall evidence was sufficient. Therefore, given the totality of all of these circumstances (each piece mounting upon the others), we simply cannot say that *no* rational finder of fact could have found Meadows guilty of intentionally or recklessly engaging in the behavior that resulted in his being in contempt of court.

The trial judge also reasonably inferred that Ross's "problem slamming doors in the past" — namely, during Meadows's January 2020 bond hearing where Ross stormed out of the courtroom and slammed the door after Meadows was released on bond — gave Meadows "knowledge that there's volatility and grieving family members as a result of him [Meadows] killing their family member." Meadows's own father, Jay Meadows, testified about how he witnessed and remembered Robert Ross's volatile emotional outburst after the judge granted his son bond in January 2020. Jay Meadows specifically recalled, "The same young man stormed -- pushed the door open, both doors; and the judge said, These two are going to change places" — indicating that Meadows was present at that outburst as the judge made them "change places," after which Ross apologized for his emotional outburst and behavior in the courtroom. Indeed, it was not surprising that the trial judge made such a finding as anyone with common sense would

understand the emotional powder keg that was present at Meadows's July 2022 guilty plea hearing, even someone without the previous experience of observing Ross's outburst at the January 2020 bond hearing.

The dissent professes that this Court engages in "speculation" that Meadows was present in the courtroom, at his own bond hearing, when Ross stormed out of the courtroom when the judge decided to grant Meadows bond and free him from incarceration before his trial. However, it is hardly "speculation" that Meadows was present in court for his own bond hearing when he was granted bond and allowed to go free with his family. Meadows's father was still there, too, when Ross stormed out of the courtroom in anger over Meadows's being freed on bond. In fact, it might well rise to "speculation" to find that Meadows was *not* there at the point the trial judge ruled, granted his motion for bond, and formally released him prior to trial.

A simple smirk alone would certainly not rise to the level of contempt, as the trial court here appropriately implied. However, the totality of the circumstances of the specific evidence in this case supports a finding that Meadows intentionally provoked Ross because Meadows knew the highly emotional state of the victim's family after their having just watched Meadows plead guilty in the courtroom to killing Ross's younger brother (and given Ross's earlier emotional outburst at the January 2020 bond hearing). Therefore, after considering the totality of the circumstances and all of the evidence in the record before us, we certainly cannot say that the trial court was plainly wrong or without credible evidence to conclude that Meadows intended to evoke a violent response from Ross — i.e., when Meadows walked toward Ross and smirked at him in the hallway right outside the same courtroom where Meadows had just pleaded guilty to killing Ross's younger brother.

Meadows also argues on brief that the evidence did not show that he actually disrupted the administration of justice. However, at oral argument before this Court, counsel for Meadows

- 16 -

acknowledged that he did not make this argument to the trial court. Meadows asks this Court to apply the "ends of justice exception" under Rule 5A:18 to this argument. However, we decline to apply the exception here because Meadows has failed to "demonstrate that he . . . was convicted for conduct that was not a criminal offense," and he has also failed to "affirmatively prove that an element of the offense did not occur."[8] *Quyen Vinh Phan Le v. Commonwealth*, 65 Va. App. 66, 74 (2015) (quoting *Redman v. Commonwealth*, 25 Va. App. 215, 222 (1997)); *see Commonwealth v. Bass*, 292 Va. 19 (2016). In short, Meadows acknowledges that he did not preserve for appeal his argument that his actions toward Ross did not actually disrupt the administration of justice.

For all of the foregoing reasons, the trial court did not err as the record provides credible evidence in support of Meadows's indirect contempt conviction, and the trial court did not abuse its discretion in so holding Meadows in indirect contempt.

### B. Validity of the Sentencing Order

Meadows also argues on appeal to this Court, "The trial court erred in finding Appellant guilty of Contempt of Court because the final sentencing order was invalid." However, the record here indicates that Meadows never raised this argument to the trial court. Indeed, Meadows did not file a motion to reconsider or any objection on this basis to the final sentencing order on the contempt charge within 21 days after the trial court entered the final order — the period in which the trial court retained jurisdiction over this case pursuant to Rule 1:1. As

---

[8] Even so, the trial judge here noted at the beginning of the contempt hearing, "There was a scuffle, disturbance in the hallway. There were a lot of court resources utilized to address it." The evidence in the record before this Court shows that numerous courthouse deputy sheriffs had to rush from different parts of the courthouse — and even from the very same courtroom where counsel for Meadows had just presented Meadows's plea deal — to deescalate the altercation between Meadows and Ross in the hallway outside the courtroom. Those courthouse deputies then also had to escort both families out of the courthouse separately to prevent any further confrontations or violence.

Meadows did not present the trial court with an opportunity to intelligently rule on his objection to the validity of the final sentencing order, Meadows's argument with respect to this assignment of error is not preserved for appellate review under Rule 5A:18. In addition, Meadows has not asked this Court to apply the good cause or ends of justice exceptions to Rule 5A:18 for this assignment of error, and we will not invoke them *sua sponte*. *See Edwards v. Commonwealth*, 41 Va. App. 752, 761 (2003) (*en banc*). Therefore, we cannot reach the merits of this assignment of error and cannot say that the trial court erred.[9]

### III. CONCLUSION

In short, the trial court was not plainly wrong or without evidence in its finding of fact that Meadows intended to evoke a violent response from Ross, that such a response did occur, and that "there were a lot of court resources utilized to address it." Meadows's act of returning to the area outside the courtroom where C.R.'s family members had gathered and then smirking at Ross as Meadows walked toward him recklessly provoked Ross and caused him to lose control of his emotions — as Ross had just watched Meadows plead guilty to the killing of Ross's younger brother. Furthermore, the record reflects that Meadows remained standing there in the hallway, where he was continuing to stare at Ross after Ross had to be restrained and pulled down the hallway away from Meadows. He simply stood there, watched, and stared at the

---

[9] "The power to summarily punish direct contempt is more limited than the power to punish indirect contempt." *Abdo*, 64 Va. App. at 475 n.3 (citing Code § 18.2-456, the statute "limiting the courts' power to summarily punish contempt to the instances listed in that statute"). Code § 18.2-456 is titled "Cases in which courts and judges may punish summarily for contempt." As this Court has previously noted, "Code §§ 18.2-456 and 18.2-457 limit the use of summary proceedings and the sentences imposed during these proceedings to the examples listed in the statute. It does not address plenary hearings for contempt conducted on the basis of a show cause or other more formal attachment." *Robinson v. Commonwealth*, 41 Va. App. 137, 146 n.7 (2003) ("As the proceeding was not for summary contempt, the trial court was not bound by the constraints of Code § 18.2-456 and acted accordingly."). Here, the trial judge issued a show cause order to Meadows on July 12, 2022, directing him to appear before the trial court on July 18, 2022, "to show cause why he should not be held in IN-DIRECT CONTEMPT for the actions taken outside the courtroom on July 11, 2022."

now restrained, flailing Ross as the situation unfolded and as courthouse deputies scrambled to defuse it, move Ross away, and quell the disruption.  Given the totality of the circumstances here and all of the specific evidence in this case, we cannot say that the trial court abused its discretion when it found Meadows guilty of indirect contempt.

For all of these reasons, we do not disturb the trial court's judgment.

*Affirmed.*

Raphael, J., dissenting.

Meadows's contempt conviction cites Code § 18.2-456 as the statute he violated. The parties agree that the relevant provision is subsection (A)(1), prohibiting "[m]isbehavior in the presence of the court, or so near thereto as to obstruct or interrupt the administration of justice." Code § 18.2-456(A)(1). As the Commonwealth notes, "None of the other provisions under the code section would appear to apply to the defendant's conduct." Commonwealth Br. 8 n.2. Because I disagree with the majority that the Commonwealth proved beyond a reasonable doubt that Meadows intended to obstruct or interrupt the administration of justice, I respectfully dissent.

"For more than a century, . . . Virginia courts have required the element of intent in order to sustain a criminal contempt conviction." *Ragland v. Soggin*, 291 Va. 282, 290 (2016). "Therefore, we must decide whether the evidence was sufficient to establish that" Meadows "intended 'to obstruct or interrupt the administration of justice.'" *Singleton v. Commonwealth*, 278 Va. 542, 549 (2009) (quoting then-Code § 18.2-456(1)).

We held in *Abdo v. Commonwealth*, 64 Va. App. 468 (2015), that Code § 18.2-456 is not a "specific-intent crime." *Id.* at 476. So the Commonwealth need not prove that the defendant intended "to accomplish the precise criminal act that [he] is later charged with." *Id.* (quoting *Winston v. Commonwealth*, 268 Va. 564, 600 (2004)). Still, *Abdo* recognized that "[t]here is no question that 'the element of intent' must be present for a defendant to be found guilty of contempt." *Id.* (quoting *Singleton*, 278 Va. at 549).

"Contempt under Virginia law is '"an act in disrespect of the court or its processes, or which obstructs the administration of justice, or tends to bring the court into disrepute."'" *Id.* (quoting *Robinson v. Commonwealth*, 41 Va. App. 137, 142 (2003)). It is an act "calculated to embarrass, hinder, or obstruct the court in the administration of justice." *Carter v.*

*Commonwealth*, 2 Va. App. 392, 396 (1986). Contempt, in short, is "'a frame of mind' that consists in 'an unwillingness to recognize the authority and dignity of the court.'" *Abdo*, 64 Va. App. at 477 (quoting John L. Costello, *Virginia Criminal Law and Procedure* § 26.4[1] (4th ed. 2014)).

As the majority correctly notes, a showing of "willfulness or recklessness satisfies the intent element necessary for a finding of criminal contempt." *Id.* A "willful" act "means an act done with a bad purpose; without justifiable excuse; stubbornly, obstinately, perversely[,] . . . without ground for believing it is lawful." *Barrett v. Commonwealth*, 268 Va. 170, 183 (2004) (quoting *United States v. Murdock*, 290 U.S. 389, 394 (1933)). It "imports knowledge and consciousness that injury will result from the act done. The act done must be intended or it must involve a reckless disregard for the rights of another and will probably result in an injury." *Id.*

I agree, of course, that the Court must "review the evidence in the light most favorable to the Commonwealth, according it the benefit of all reasonable inferences." *Singleton*, 278 Va. at 548. We may reverse the trial court's judgment "only upon a showing that it is plainly wrong or without evidence to support it." *Id.* But several cases have vacated the trial court's contempt finding when the evidence failed to prove the defendant's intent to obstruct or interrupt court proceedings.

For instance, our Supreme Court in *Singleton* reversed two contempt convictions of defense lawyers who, after reaching agreement with the prosecutor to request a continuance, told a client or a witness not to appear in court. 278 Va. at 551. The Supreme Court acknowledged that the defense lawyers' actions tied the hands of the trial judges, effectively forcing them to grant a continuance when the client or witness did not appear. *Id.* at 552. But the evidence failed to show that either lawyer "intended" to obstruct or interrupt the administration of justice. *Id.*

- 21 -

Similarly, we held in *Carter* that the trial court erred in holding a defendant in criminal contempt for requesting a jury trial the day before trial, forcing a continuance because no jurors had been summoned. 2 Va. App. at 399. The evidence failed to show that the defendant's "delayed request was made for the purpose of obstructing or interrupting the administration of justice and not just for the purpose of exercising" his constitutional right to a jury trial. *Id.*

I would hold that the Commonwealth's evidence here likewise failed to prove Meadows's intent to obstruct or interrupt the administration of justice, let alone flout "the authority and dignity of the court." *Abdo*, 64 Va. App. at 477 (quoting Costello, *supra*, § 26.4[1]). The entire incident involving Ross and Meadows, after they and their families exited the courtroom, lasted about 15 seconds. The video entered into evidence shows Ross and Meadows crossing paths at a set of double doors separated by a column. Ross was exiting the hallway to walk to the escalators. Meadows was returning because he forgot that his lawyer wanted to speak with him after the hearing. Neither could see the other coming.

Ross testified that they "made eye contact" and Meadows had "a little smirk" on his face. The video shows that Ross reacted immediately, backing up and raising his hands to his head. Ross's family members immediately restrained him and pulled him back into the hallway, towards the courtroom that everyone had emerged from just seconds earlier. That initial encounter lasted about two seconds.

The trial court found that Meadows "was smirking" when he first encountered Ross. Even so, the court found that Meadows "didn't walk up on Mr. Ross on purpose"; "he didn't encounter Mr. Ross on purpose." The court found that this conduct by itself was not contumacious: "When [Meadows] encounters Mr. Ross . . . by that door, is that contemptuous? No. *But he kept going*." (Emphasis added.)

- 22 -

The decisive conduct on which the trial court relied is what happened next: "[W]hat's telling to the court is the behavior of the defendant *when Mr. Ross is restrained*." (Emphasis added.) Meadows was "looking straight at [Ross], not changing his gait, walking towards the area where Mr. Ross is." The court acknowledged, at that point, "you can't tell if [Meadows is] smirking or not, but he's certainly determined to stay in that space." That was the rub for the trial judge, who said, "I think any reasonable recipient who has had a family member killed by the defendant who witnesses this would react violently."

For discussion purposes, let's divide the 15-second encounter into the initial 2 seconds, in which Ross lost his temper, and the last 13 seconds, when Ross was dragged down the hallway by family members and also by deputies.

The initial two seconds cannot support the contempt finding. The standard of review, of course, requires that we credit the trial court's finding that Meadows had a "smirk" on his face when Ross first saw him at the doorway. But the word *smirk* is doing a lot of work in the analysis of the majority and the trial court. That word dates to the ninth century and means, "To smile; in later use, to smile in an affected, self-satisfied, or silly manner," *Smirk*, *The Compact Edition of the Oxford English Dictionary* (1971); "to smile in an affected or conceited manner," *Smirk*, *Webster's Third New Int'l Dictionary Unabridged* (2021). Whether Meadows was smirking or just smiling is a subjective judgment that lies in the eye of the beholder. I accept that Ross perceived that Meadows was smirking.

But is Ross's interpretation of Meadows's facial expression enough to conclude beyond a reasonable doubt that Meadows actually smirked "with a bad purpose; without justifiable excuse; stubbornly, obstinately, perversely[,] . . . without ground for believing it is lawful"? *Barrett*, 268 Va. at 183 (quoting *Murdock*, 290 U.S. at 394). Or that Meadows understood that by forming a

- 23 -

"smirk," he would cause Ross to fly into a rage and cause a disturbance? Does the evidence show that Meadows intended to provoke Ross? I think not.

For his part, Meadows offered a perfectly innocent, justifiable excuse for his actions. *See id.* He was returning to the courtroom because he had forgotten that his lawyer wanted to speak with him. Meadows was smiling because the plea agreement that the Commonwealth had just accepted resulted in reduced charges, a cap on jail time, and Meadows's being released on bond pending sentencing. As Meadows testified, he was "extremely happy" because "I got to go home and see my daughter." I see nothing in the record to support the speculation that Meadows knew or should have known that, if he "smirked," it would be unlawful because he would send Ross into a fiery rage, requiring multiple court deputies to respond to keep order.

I also disagree with the majority that the record supported the trial court's inference that Meadows knew that Ross could be so easily provoked. The facts are too flimsy to support that speculation. For one thing, Ross admitted that it was "very inappropriate" for him to have suddenly lost his temper upon encountering Meadows at the doorway.

For another, the record fails to show that Meadows knew about Ross's volatility. Ross testified that he had attended Meadows's January 2020 bond hearing—two-and-half years earlier. Ross said that he "left the courtroom" after bail was granted because he was emotional. He said the judge called him back to speak to him about his behavior, for which Ross "apologized." Yet the Commonwealth presented no evidence that Meadows witnessed Ross's hot-headedness at the earlier bond hearing or knew that Ross was the victim's brother. The Commonwealth introduced no security-camera footage from that hearing. To be sure, the trial court heard testimony that Meadows's *father* witnessed Ross's conduct at the January 2020 hearing. After Ross "stormed" out of the courtroom, the father heard the hearing judge say "[t]hese two are going to change places." But the father was never asked if *Meadows* witnessed

- 24 -

Ross's walking out of the courtroom or Ross's later apology to the hearing judge. Nor was the father asked if Meadows knew Ross or knew Ross's relationship to the victim. So I would not credit the trial court's inference that Meadows knew that Ross was volatile, let alone who Ross even was. That is not a "reasonable inference[] fairly deducible" from the facts. *Singleton*, 278 Va. at 548.

As for the last 13 seconds of the incident, the record provides no evidence to show that Meadows acted "with a bad purpose; without justifiable excuse; stubbornly, obstinately, perversely," or "without ground for believing [that his conduct was] lawful." *Barrett*, 268 Va. at 183 (quoting *Murdock*, 290 U.S. at 394). The picture selected by the majority, *ante* at 12, shows Ross standing in the hallway, looking down the corridor as Ross was being dragged away from him. Meadows was joined several seconds later by his family members.

The trial court said that what happened in this second part of the incident was integral to finding Meadows in contempt: Meadows was "looking straight at [Ross], not changing his gait, walking towards the area where Mr. Ross is." That omits that Ross was being dragged away in the opposite direction. And as the court acknowledged "you can't tell if [Meadows is] smirking or not."

Because Ross had already erupted and was being carried away during this second phase of the incident, Meadows cannot be said to have engaged in contumacious conduct simply by standing there with his family, looking down the hallway. Simply standing there, in a public courthouse, looking down the hallway, fails to show that Meadows took any action taken with "knowledge and consciousness that injury will result from the act done." *Abdo*, 64 Va. App. at 477. Indeed, Meadows had a perfectly good reason to be standing there: he needed to speak with his attorney outside the courtroom. And the scrum of people moving down the hallway with Ross in tow now lay between Meadows and his lawyer.

Finally, I would not paper over the absence of evidence of Meadows's contumacious intent by relying on the inference that the trial judge must have thought that Meadows lied on the witness stand. Meadows denied having "smirked" and testified that he intended no disrespect to the victim or his family. The majority reasons that by disbelieving Meadows, the trial judge could treat Meadows's denial of guilt as "affirmative evidence of guilt." *Ante* at 14 (quoting *Morris v. Commonwealth*, 269 Va. 127, 134 (2005)).

But our appellate precedent has never permitted the use of a negative inference from the defendant's testifying in his own defense to prove an essential element of the Commonwealth's case when the Commonwealth itself has failed to prove that element.

> The giving by the accused of an unclear or unreasonable or false explanation of his conduct or account of his doings are matters for the [factfinder] to consider, but they do not shift from the Commonwealth the ultimate burden of proving by the facts or the circumstances, or both, that beyond all reasonable doubt the defendant committed the crime charged against him.

*Foster v. Commonwealth*, 209 Va. 326, 330-31 (1968) (quoting *Smith v. Commonwealth*, 192 Va. 453, 461 (1951)). In cases like *Morris*, cited by the majority, there was ample evidence to prove that the defendant knowingly possessed a firearm as a convicted felon. 269 Va. at 133. It was in that vein that the Court said that the trier of fact could disbelieve the defendant's testimony and consider it "as affirmative evidence of guilt" that the defendant was lying to conceal his guilt. *Id.* at 134. *Morris* did not rely on such a negative inference alone to uphold the conviction. Indeed, consistent with the rule in *Foster*, our appellate courts have repeatedly held that the Commonwealth cannot prove the defendant's guilt based solely on the inference that the defendant might have been disbelieved when he denied an essential element of the crime.[10]

---

[10] *See, e.g.*, *Tarpley v. Commonwealth*, 261 Va. 251, 256-57 (2001) ("The trial court . . . was entitled to disbelieve Tarpley's assertion that he did not intend to 'steal' the car when he

\* \* \*

The reader will be forgiven for thinking that Ross should have been held in contempt for causing the "melee" here, *ante* at 5, not Meadows. I would "hold that the evidence was insufficient to establish that" Meadows "intended 'to obstruct or interrupt the administration of justice.'" *Singleton*, 278 Va. at 551 (quoting then-Code § 18.2-456(1)). I see no evidence, taken in the light most favorable to the Commonwealth, showing any act by Meadows that was "calculated to embarrass, hinder, or obstruct the court in the administration of justice." *Carter*, 2 Va. App. at 396. "In the absence of such intent, . . . the evidence is insufficient to sustain [the] conviction[] for criminal contempt . . . ." *Singleton*, 278 Va. at 551.

I would reverse the judgment, vacate the conviction, and dismiss the charge.

---

drove it away from the scene of the fight. However, the trial court's rejection of that testimony does not provide a factual basis for establishing beyond a reasonable doubt that Tarpley intended to deprive Bruce of his car permanently, rather than temporarily."); *Burrows v. Commonwealth*, 224 Va. 317, 319 (1982) ("The Commonwealth argues the trier of fact was free to draw inferences of guilt from the facts that Burrows fled the scene and that he gave a statement to the police denying he knew where King William County was. However, the defendant explained his conduct, and these facts are not inconsistent with his innocence."); *Tucker v. Commonwealth*, 18 Va. App. 141, 144 (1994) ("Although it was within the province of the jury to assess the credibility of appellant's testimony, the mere conclusion that appellant had lied to conceal his guilt was insufficient to provide a basis for inferring that he had the requisite knowledge . . . .").